UNITED STATES of America,
Plaintiff/Appellee,

v.

Alexander Robert HOLZMAN,
Defendant/Appellant.

UNITED STATES of America,
Plaintiff/Appellee,

v.

James WALSH, Defendant/Appellant.

Nos. 85–1365, 86–1000.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 6, 1987.

Decided April 7, 1989.

1498

Richard K. Perkins, Honolulu, Hawaii, Alan Silber, New York City, for defendant-appellant.

R. Michael Burke, Honolulu, Hawaii, for plaintiff-appellee.

Before POOLE, NORRIS and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

This is the consolidated appeal of Alexander Holzman and James Walsh who were convicted of passing, and conspiring to pass, forged United States Savings Bonds. Appellants contest the district court's denial of their joint motion to suppress evidence obtained during the search incident to their arrest, and the subsequent search of their hotel rooms.

I

BACKGROUND

On the evening of December 19, 1983, Arizona Police Detective Hill was working off-duty as a security employee for a department store in Scottsdale, Arizona. He

saw two men, Holzman and Walsh, enter the store together and walk to a fragrance counter. Hill recognized one of the men, Walsh, as a suspect he had seen in bank video surveillance photographs relating to a credit card fraud scheme he had been investigating while on duty.

When it looked as if Holzman and Walsh were going to make a purchase, Hill moved closer to observe how they would pay for the merchandise. He allegedly saw Walsh produce an American Express card with a white abrasion mark on its face, a feature common to many stolen and altered cards with which Hill was familiar. After advising the clerk to keep the purchase slip, he followed the two men through the store.

Hill noticed that the men spoke with eastern accents, and, he was aware that the fraud he was investigating involved New York accounts. The two men allegedly started acting in a suspicious manner, continually looking in his direction. Hill then made a call to the police department requesting backup for an arrest. When two uniformed officers and two detectives arrived, Hill announced the arrest of Walsh in a loud voice, and proceeded to inform him of his rights. Upon a search of Walsh, Hill found, among other things, a Camelback Inn room key # 136; a number of credit cards bearing different names; business cards of a jewelry dealer and an investment counselor; and a large amount of cash.

Detective Keeley, one of the detectives that had just arrived, made eye contact with Holzman, who looked away, turned, and began walking. Keeley attempted to cut him off, but Holzman reversed direction and then turned again toward an outside exit. Hill yelled for the detectives to stop Holzman, which they did. At that time, Holzman allegedly stated: "I'm not with that guy" (referring to Walsh).

When Hill began asking questions, he noted that Holzman appeared "extremely nervous." Holzman gave his name, but some of his other answers allegedly were evasive or incoherent. Hill asked Holzman for some identification, and Holzman produced a wallet. As Holzman searched through the wallet, Hill claimed that he could plainly observe a number of credit cards bearing different names. Holzman presented a New Jersey driver's license without a picture, of the paper variety which in Hill's experience were frequently and recently used by fraud suspects. Hill then placed him under arrest. Upon a search of Holzman, Hill found, among other things, a Camelback Inn room key # 135; a number of credit and identification cards bearing different names (one in the name of Joane Bauer); two driver's licenses bearing different names with the photo of Walsh; a driver's license with a photo of an unknown female in the name of Joane Bauer; a driver's license with a photo of an unknown male in the name of David Bauer; a large amount of cash; sheets of paper bearing the names "Dall", "Barb", and "Jimmy", as well as currency notations; and an address book.

Following the arrests, at approximately 9:30 p.m., Hill went to the police station, but returned to the department store shortly thereafter upon receiving a telephone call from a store employee. At the department store, Hill learned that store personnel had discovered a set of rental car keys and a credit card slip under merchandise on a counter where Holzman had been standing at the time of Walsh's arrest. The credit card slip revealed that a credit card in the name of "Steven Blatinstein" had been used earlier that day at a nearby restaurant. Hill recognized this name from one of the credit cards possessed by Walsh at the time of his arrest. Calling the restaurant, Hill learned that a party of four had dined at the restaurant earlier that evening.

At approximately 10:30 p.m., Hill again went to the police station. There, he placed a telephone call to the Camelback Inn in Paradise Valley, Arizona, in an effort to verify the source of the hotel keys found on the persons of Holzman and Walsh. He learned that rooms # 135 and # 136 were registered to the same name as had been used at the restaurant, "Steven Blatinstein."

Still later that evening, accompanied by Arizona Police Detective Arnold, Hill made another trip to the department store. Using the earlier discovered rental car keys, the officers secured the rental car and impounded it at the police station. The two then proceeded to the Cambelback Inn; it was approximately midnight.

Once at the hotel, Hill and Arnold attempted to look into the curtained windows. They noted a light in room # 135, but were unable to tell if the rooms were occupied. To dispel their uncertainty, the officers knocked, and then using the room keys seized earlier, entered the rooms; they had no warrant at that time. The officers did not find any other suspects in their rooms, and allegedly did not look for contraband.

Because of the layout of the rooms, the cold temperature that night, and limited manpower, Hill deemed it impossible to properly secure both rooms from the outside until a warrant could be obtained. Therefore, Arnold remained inside the adjoining rooms while Hill returned to the police station to obtain a warrant and continue the investigation. During the night, the telephones in both rooms rang several times. Arnold answered only the calls in room # 135, each time responding as though the caller had reached the wrong number. Fearing that he might be in danger, Arnold requested assistance in securing the rooms. Eventually, a second police officer arrived.

Before noon of the next day, Hill had drafted an affidavit and search warrant, and presented them to a judge of the Scottsdale County Court. The judge authorized a search, and the warrant was executed. The search uncovered numerous identification cards with various names, most bearing Walsh's photograph; numerous credit cards with various names; three

thousand dollars in travelers checks; and a bag containing 665 savings bonds in the names of Joane and David Bauer (identification and credit cards with these names had been found on Holzman and Walsh at the time of their arrest).

Holzman and Walsh subsequently were indicted by a grand jury in the district of Hawaii on twelve counts of passing United States Savings Bonds containing forged endorsements in violation of 18 U.S.C. § 510, and one count of conspiracy to commit the same in violation of 18 U.S.C. § 371. They moved the district court to suppress the evidence obtained during the searches noted above, arguing the unreasonableness of the investigatory stop, arrest, and search incident to the arrest of Holzman; the warrantless entry and impoundment of the hotel rooms; and the warranted search of the hotel rooms. After a hearing, a magistrate recommended that the evidence not be suppressed. The district court adopted that recommendation and denied the motion. A jury trial ensued, Holzman and Walsh were each found guilty on all thirteen counts, and they were sentenced to what amounts to 25 and 10 years imprisonment respectively. On appeal, Holzman and Walsh renew the challenges they raised in support of their motion to suppress.[1] We generally review de novo the denial of a motion to suppress. *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir.1986).

## II

## DISCUSSION

### A.

### *Seizure and Search of Holzman*

Initially, appellants contend that all evidence discovered during the search incident to Holzman's arrest should be suppressed. In support of this contention they allege three occasions of unconstitutional police

---

1. Both the motion to suppress and this appeal were filed jointly by Holzman and Walsh. However, any evidence seized as a result of the detention, arrest, and search of Holzman was obtained not by any alleged violation of Walsh's constitutional rights, but rather by an alleged violation of Holzman's constitutional rights. Therefore, only Holzman has asserted a viable

challenge to the legality of his detention, arrest, and search, and only he may obtain relief. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *United States v. Perez*, 644 F.2d 1299, 1303 nn. 1, 2 (9th Cir. 1981). Walsh has asserted, along with Holzman, a viable challenge to the legality of the searches of their adjoining hotel rooms.

conduct. First, they argue that the original detention of Holzman was an invalid investigatory stop. Second, they argue that the formal arrest of Holzman was unsupported by probable cause. As a result, they argue that the search incident to Holzman's arrest was unjustified. Finally, they argue that even if the search incident to Holzman's arrest was justified, it was unreasonable for the police, without a warrant, to search the address book found on Holzman. We address each of these arguments in turn.

### 1. *Investigatory Detention*

As a general principle, the police must have probable cause to seize an individual, even if no formal arrest is made. *Dunaway v. New York*, 442 U.S. 200, 207–08, 99 S.Ct. 2248, 2253–54, 60 L.Ed.2d 824 (1979). However, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court "first recognized 'the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause.'" *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983) (quoting *Michigan v. Summers*, 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981)). Appellants claim that the initial encounter between the police and Holzman was more than a limited intrusion, but rather, it amounted to an official seizure for which probable cause was required, but lacking. We find no merit in this position.

That the detention of Holzman constituted a seizure from the onset is not disputed. Therefore, it is irrelevant that Holzman believed he was not free to leave. *See United States v. Patterson*, 648 F.2d 625, 632–33 and n. 21 (9th Cir.1981). It is also undisputed that the police had no probable cause to arrest Holzman when he was initially seized. Whether that initial seizure is one that may be justified by less than probable cause rests on a balancing of competing interests. "We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Place*, 462 U.S. at 703, 103 S.Ct. at 2642.

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). It is important to consider "whether the police diligently pursued their investigation" during the detention. *Place*, 462 U.S. at 709, 103 S.Ct. at 2645; *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). The investigative methods employed should be minimally intrusive, *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325, yet, that a less intrusive method was available does not necessarily render the seizure unreasonable. *United States v. Montoya de Hernandez*, 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985); *Sharpe*, 470 U.S. at 686–87, 105 S.Ct. at 1575–76. The crucial inquiry is whether the police were unreasonable in failing to recognize or pursue the less intrusive method. *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575.

In this case, even if Holzman's version of the facts is believed, the investigatory detention was of short duration. Five to seven minutes passed between the time Holzman was confronted and the time Hill began his interrogation. This delay is not unreasonable when we consider the totality of the circumstances. Hill was directing the police operation, and at the moment of Holzman's seizure, Hill was nearby, involved in the arrest and search of Walsh. The government's version of the facts, which the district court adopted, supports the conclusion that Hill was diligent in concluding with Walsh and instituting Holzman's interrogation, which lasted only a "couple" of minutes. Appellants make no claim that Hill was not diligent during that period. Thus, the duration of Holzman's detention was reasonable. *Cf. Sharpe*, 470 U.S. at 688, 105 S.Ct. at 1576; *United States v. Bautista*, 684 F.2d 1286, 1290–91 (9th Cir.1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983).

■ As to the methods employed, Holzman was confronted near the outside door of the department store, frisked for weapons, moved to a remote counter area, asked for identification, and briefly interrogated. Appellants claim that under the circumstances, these methods exceeded the scope of a minimally intrusive investigatory stop. We disagree.

Appellants emphasize that the police "showed authority" and "manually restrained" Holzman. However, because the officers believed that Holzman was attempting to flee the area, such an overt show of force appears to have been justified. *Cf. Bautista*, 684 F.2d at 1289–90 (handcuffing justified under the circumstances). Appellants also point to the movement of Holzman from the open floor to the more private counter area. But that is not the sort of transporting that has been found overly intrusive. *Cf. Royer*, 460 U.S. at 504–05, 103 S.Ct. at 1328 (movement from airport concourse to interrogation room not justified). Indeed the *Royer* plurality stated that certain movement to a more private area undoubtedly may be justified by concerns of safety and security. In this case, the movement clearly allowed for a more efficient interrogation while exposing Holzman to de minimis additional intrusion. *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). Finally, we cannot conclude that the frisk for weapons, request for identification, and limited interrogation were unreasonable methods given the context of Holzman's interrogation. *See Sharpe*, 470 U.S. at 687, 105 S.Ct. at 1576; *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975); *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

On the other side of the balance, we believe that the government interest in detecting ongoing crime and immediately apprehending the perpetrators is unquestionably substantial. *See Terry*, 392 U.S. at 22–23, 88 S.Ct. at 1880–81. The alleged crime in this case was of a serious nature, involved transient suspects, and was being committed within the plain view of a police officer. If Hill's conclusions were justified,

it would have been "poor police work" to allow Holzman to exit the store into the streets of Scottsdale without detention. *See id.* at 23, 88 S.Ct. at 1881.

■ In light of the minimal intrusion on Holzman's Fourth Amendment interests and the substantial government interest, the initial seizure in this case is one that could have been justified based on less than probable cause. The objective justification that is required is "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam). "[T]he totality of the circumstances—the whole picture—must be taken into account. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Appellants are correct when they state that Holzman is not made a suspect in the credit card fraud merely by associating with Walsh. *See Ybarra v. Illinois*, 444 U.S. 85, 92–94, 100 S.Ct. 338, 342–44, 62 L.Ed.2d 238 (1979); *Sibron v. State of New York*, 392 U.S. 40, 63–64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). But in this case, Hill has articulated more than Holzman's association with Walsh on the evening in question. First, from Hill's fraud investigation, he believed that Walsh was operating with an accomplice. Second, Hill observed Holzman look on and offer direction as Walsh purchased merchandise with what appeared to be a counterfeit credit card. Third, Hill noticed that both men spoke with eastern accents, an observation consistent with the fraud investigation. Fourth, Hill observed both men continually scanning the area, and monitoring Hill's movements once they were aware of his presence. Fifth, Hill could detect large bulges in the pockets of both men's pants, which he assumed to be cash received from cash advance credit card frauds. Finally, after Walsh was arrested, Hill could see

Holzman move out of the area and evasively turn toward an outside exit.

Appellants also challenge certain inferences that Hill drew from his observations. For example, they argue that it was unreasonable for Hill to anticipate an accomplice based on evidence that adjoining rooms in local hotels had been booked with counterfeit credit cards on two recent occasions. They similarly argue that it was unreasonable for Hill to interpret Holzman's behavior as suspicious simply because Holzman appeared evasive after Walsh's arrest. We disagree.

Whereas Hill did not know for a fact that Walsh was operating with an accomplice, the evidence clearly permits such an inference. Hill was entitled to consider that possibility as one piece in the mosaic of his investigation. As to Holzman's evasive behavior, it too must be considered in the totality of the circumstances. This is not a case where the officer seeks to justify the seizure on evasive action alone. *See United States v. Jones,* 619 F.2d 494, 498 (5th Cir.1980). Hill had just witnessed what he believed was a crime, and arrested a person that was also a suspect in other related crimes. Under those circumstances, it does not appear unreasonable to be suspicious when the companion of the arrested person attempts to flee the scene. *See United States v. Sokolow,* 831 F.2d 1413, 1419 (9th Cir.1987), *cert. granted,* — U.S. —, 108 S.Ct., 2033, 100 L.Ed.2d 618 (1988) ("evasive movements are part of the performance of the crime").

Lastly, appellants contest many of the district court's factual findings. Our review of the record reveals nothing upon which we may conclude that those findings are clearly erroneous. There is some conflicting testimony concerning the proximity of Hill to the fragrance counter, the number of people in various areas of the department store, whether Holzman and Walsh sensed Hill's pursuit (and if so whether they sensed he was a security officer), and whether Holzman and Keeley

made eye contact that prompted Holzman to flee. However, resolution of these conflicts can only be accomplished by determinations of weight and credibility. Either version may have been true, and neither is against an overwhelming quantity of contrary evidence. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Hill has articulated the basis of his suspicion that Holzman was engaged in criminal activity; we have summarized it above. In the totality of the circumstances of this case, we believe that Hill's suspicion was reasonable. The investigatory detention of Holzman was therefore justified at its inception.

## 2. *Arrest*

■ After a brief interrogation, Hill formally arrested Holzman. Such a seizure may be made without a warrant if supported by probable cause. *See Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979). Hill had probable cause to arrest Holzman if, at the moment of the arrest, he had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that Holzman had committed or was committing a criminal offense.[2] *See United States v. Hillison,* 733 F.2d 692, 697 (9th Cir.1984). In assessing probable cause, the totality of the circumstances again must be considered. *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

In addition to the facts and circumstances, discussed above, which justified the investigatory detention of Holzman, the record reveals that during the investigatory detention, Hill made additional observations. First, Holzman denied any association with Walsh, a statement that was contradicted by Hill's surveillance up to that

**2.** It is clear, and appellants do not argue to the contrary, that Hill had probable cause to arrest Walsh at the moment Hill recognized Walsh as

the fraud suspect he had seen in bank surveillance photographs.

point. Second, Holzman was visibly trembling and gave evasive responses to simple questions. Third, as Holzman was searching through his wallet for identification, Hill noticed several credits cards, all from the same company and "bearing obviously different names." Finally, Holzman presented a driver's license without a picture, of the paper variety which in Hill's experience were frequently and recently used by fraud suspects.

Again, appellants challenge these observations by disputing the accuracy of the facts and the reasonableness of the inferences drawn from them. However, as with the observations made before the investigatory detention the factual disputes could only be resolved by determinations of weight and credibility. Here, as there, the record does not permit us to assign clear error to the district court's findings. *See Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

As to the inferences drawn, especially from the observation of numerous credit cards, we believe they were not only reasonable, but virtually inescapable. By the time Hill noticed those credit cards, he was aware of an array of circumstances. Although many of these circumstances, taken alone, arguably could have been consistent with innocent or criminal behavior, when viewed in their totality they would lead a prudent person to believe that Holzman was engaged in criminal activity.

Probable cause is a conclusion drawn from probabilities. *See Gates*, 462 U.S. at 231, 103 S.Ct. at 2328. From Hill's experience and surveillance, it was probable, more likely than not, that Holzman was Walsh's accomplice and therefore engaged in a scheme of credit card fraud. As a result, Hill was justified in arresting Holzman when he did. The seizure was not unreasonable within the meaning of the Fourth Amendment.

### 3. *Search Incident to Arrest*

Because Holzman was validly arrested, appellants' general argument, that the warrantless search of Holzman's person was unconstitutional, is unfounded. "Under the Fourth and Fourteenth Amendments, an arresting officer may, without a warrant search a person validly arrested." *See DeFillippo*, 443 U.S. at 35, 99 S.Ct. at 2631. Appellants, however, make one more specific argument. They contend that even if Holzman was validly arrested, the contents of the address book found on Holzman's person could not be examined in connection with a warrantless search incident to a valid arrest.

First, appellants maintain that the police had no authority to search the contents of Holzman's address book at the time and place of the arrest. As support, appellants rely on *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality); *United States v. Wright*, 667 F.2d 793 (9th Cir.1982); *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984); and *United States v. Szymkowiak*, 727 F.2d 95 (6th Cir.1984), for the proposition that the evidentiary nature of the discovered item must be immediately apparent, and that probable cause must exist. Thus, appellants reason, because Hill testified that he was not impressed with the evidentiary nature of the address book until well after the arrest, his warrantless search of the address book at the scene of the arrest was unlawful.

Appellants have misunderstood the law surrounding a search incident to a lawful arrest. The cases upon which they rely are concerned with the principles of the "plain view" doctrine. Although "plain view" and "search incident to arrest" may be considered exceptions to the warrant requirement, they are separate concepts controlled by separate principles and authority.

 The address book was seized from Holzman's person during a lawful arrest and immediately examined by the police. In light of the precedent of *New York v. Belton*, 453 U.S. 454, 457-62, 101 S.Ct. 2860, 2862-65, 69 L.Ed.2d 768 (1981), *United States v. Robinson*, 414 U.S. 218, 234-37, 94 S.Ct. 467, 476-77, 38 L.Ed.2d 427 (1973); and *Chimel v. California*, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 2039-40, 23 L.Ed.2d 685 (1969), this police conduct does not offend Holzman's Fourth Amendment

interest. *See also United States v. Edwards,* 415 U.S. 800, 804–05, 94 S.Ct. 1234, 1237–38, 39 L.Ed.2d 771 (1974). For an item to be validly seized during a search incident to an arrest, the police need not have probable cause to seize the item, nor do they need to recognize immediately the item's evidentiary nature. *Robinson,* 414 U.S. at 235, 94 S.Ct. at 476.

Upon Hill's return to the police station he again searched the contents of the address book and discovered inculpatory evidence. Appellants maintain that *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538, and *United States v. Monclavo–Cruz,* 662 F.2d 1285, 1287–88 (9th Cir. 1981), invalidate this search because it was conducted at a remote time and place. While *Chadwick* and *Monclavo–Cruz* dealt with searches subsequent to arrest, they are easily distinguishable from the case at bar. Both involved *initial* investigatory searches that took place subsequent to arrest, later in time and place. Here the initial search was conducted incident to arrest. Remoteness becomes an issue only if an individual retains an expectation of privacy in the seized property; there is no continued expectation of privacy if it has been effectively destroyed by a valid search incident to arrest. *See United States v. Burnette,* 698 F.2d 1038, 1049 (9th Cir.), *cert. denied,* 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983).

This court has demarcated the limits on the government's authority to search property taken from an individual during an arrest and searched at a remote time and place. If an individual is arrested and his property seized, but not searched, the arrest and seizure in and of themselves do not work to deprive the individual of his fourth amendment privacy interest in the seized property; subsequent warrantless searches of the property are invalid. *See United States v. Monclavo Cruz,* 662 F.2d 1285, 1290 (9th Cir.1985). If an individual is arrested and his property *searched* incident to arrest, however, the individual's expectation of privacy in the property is significantly reduced; subsequent warrantless searches are valid "so long as [the item] remains in the legitimate uninterrupt-

ed possession of the police...." *Burnette,* 698 F.2d at 1049.

In *Burnette,* police were investigating a bank robbery. When a police officer requested identification from a suspect who was being arrested, she began to open her purse and then quickly closed it. She then turned away from the officer and again began to open her purse. Fearing that the suspect was retrieving a weapon, the officer seized the purse and observed that it contained a large sum of money. A subsequent inventory of the contents of the purse at the police station revealed that some of the money had been taken in the robbery. *Id.* at 1044. We held that the subsequent search was valid despite the fact that the search incident to arrest was performed in a cursory fashion; the contents of the purse had been fully exposed to the police, thus significantly reducing the defendant's expectation of privacy. *Id.* at 1049.

■ In the present case the arresting officer legitimately examined the address book during the valid arrest of Holzman, and determined that it contained "a bunch of names and numbers." At that point appellant's expectation of privacy in the contents of the book was significantly diminished. Like opening Burnette's purse and determining that it contained a large sum of money, opening the address book and determining that it contained names and numbers exposed its contents to the police to such an extent that Holzman could no longer reasonably expect that the contents of the book would be free from further examination by the officers. Accordingly, the subsequent search of the book was validly conducted; a warrant was not necessary.

### B.

### *Hotel Room Searches*

Appellants also contend that all evidence discovered during the search of their hotel rooms at the Camelback Inn should be suppressed. In support of this contention they make three further assertions of constitutional error. First, appellants claim that

the police had no justification for entering their hotel rooms without a warrant and securing the rooms until a warrant was obtained. Second, they claim that the warrant that was obtained was over broad on its face and as executed. Finally, they claim that the affidavit in support of the search warrant was insufficient to establish probable cause. We address each of these challenges in turn.

### 1. Warrantless Entry

The initial entry of appellants' hotel rooms and search for occupants therein clearly qualifies as a "search" within the meaning of the Fourth Amendment. *See United States v. Allard,* 600 F.2d 1301, 1303 (9th Cir.1979) (citing *Johnson v. United States,* 333 U.S. 10, 17, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948)). Because the police did not possess a search warrant at that time, the search was unreasonable unless two factors can be established. First, the police must have had probable cause to believe that seizable items would be found within the hotel rooms. Second, the search must have been justified by a recognized exception to the warrant requirement. *See Allard,* 600 F.2d at 1303. The burden is on the government to show that the search was not unreasonable. *See Arkansas v. Sanders,* 442 U.S. 753, 760, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979).

We find the facts and circumstances surrounding the arrest of Holzman and Walsh sufficient to establish probable cause to search the hotel rooms. As discussed above, Hill had probable cause to believe that appellants were participants in a wide scheme of credit card fraud. Certain items carried by appellants at the time of their arrest—numerous counterfeit credit and identification cards, large amounts of cash—suggested that additional items of that sort existed elsewhere. Furthermore, the hotel keys and rental car reasonably indicated that appellants had limited resources for local storage of their possessions.

The government claims that in addition to probable cause, "exigent circumstances" justified the warrantless entry of the hotel rooms. The existence of exigent circumstances is a recognized exception to the warrant requirement. *United States v. Kunkler,* 679 F.2d 187, 191 (9th Cir.1982). We have established the following standard:

> Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained. The need for an immediate search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement. There must be no practical way to avoid these risks and yet follow the Constitution's mandate of detached judicial supervision of such intrusions.

*United States v. Robertson,* 606 F.2d 853, 859 (9th Cir.1979). Exigent circumstances have been found when the police "reasonably believe from the totality of the circumstances that ... evidence or contraband will imminently be destroyed." *Kunkler,* 679 F.2d at 191.

The police have not claimed that they feared for their safety at any time surrounding the entry of the hotel rooms. Also, unless the rooms were occupied, the seizable items were in no danger of being destroyed. Therefore, the crucial inquiry is whether, at the moment of entry, the police reasonably believed that the rooms were occupied and that there was imminent danger of evidence being destroyed.

The record reveals that the police did not know, nor were they reasonably certain that the rooms were occupied. *Contra United States v. Hicks,* 752 F.2d 379, 383–84 (9th Cir.1985); *U.S. v. Salvador,* 740 F.2d 752, 758–59 (9th Cir.1984). Before entering the rooms, they made little effort to detect the presence of occupants. The extent of their investigation was to look through the curtained windows, listen outside the doors, and scout the back of the units. Although they noted a light in one of the two rooms, they saw or heard nothing conclusive. The police admit that they

did not contact hotel personnel or attempt to place a telephone call to the rooms.

Thus, at the moment of entry, the police had only a suspicion that two accomplices may be in the rooms or in the general vicinity. The police were aware of no facts that indicated that these possible accomplices had access to appellants' rooms. Such vague suspicions hardly provide that immediacy that is required by *Robertson*. *See Allard*, 600 F.2d at 1304.

The government claims that only one officer was available to secure the rooms. It contends that due to the construction of the hotel and the cold temperatures, one officer could not have adequately preserved the status quo. Yet, the record reveals that no attempt was made to obtain the services of additional officers. Nevertheless, in light of the weakness of the suspicion involved, the police cannot justify intruding on appellants' privacy interests by arguing inconvenience or impracticality. We therefore find the warrantless entry of appellants' hotel rooms to have been unlawful.

■ Our finding of an unlawful warrantless entry or search does not automatically render excludable all items seized during the subsequent warranted search. However, if an item was unreasonably seized during the entry or tainted thereby, then exclusion would be appropriate. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963).

The record reveals that Arnold did not actually seize any items during his thirteen hour, warrantless presence in the hotel rooms. And if the contents of the rooms were effectively seized during that period, that seizure was not unreasonable. The Supreme Court has held that because the seizure of a dwelling affects only possessory interests, not the more sensitive privacy interests intruded upon by a search, "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984).

This conclusion is not altered by the officers' decision to secure the adjoining rooms from the inside:

> Arguably, the wiser course would have been to depart immediately and secure the premises from the outside by a 'stakeout'.... But the method actually employed does not require a different result under the Fourth Amendment, insofar as the *seizure* is concerned.... [A]bsent exigent circumstances, the entry may have constituted an illegal *search*, or interference with petitioners' privacy interests, requiring suppression of all evidence observed during the entry. Securing of the premises from within, however, was no more an interference with the petitioners' possessory interests in the contents of the apartment than a perimeter 'stakeout.' In other words, the initial entry—legal or not—does not affect the reasonableness of the seizure.

*Segura*, 468 U.S. at 811, 104 S.Ct. at 3388–89 (emphasis in original). Nor is our conclusion altered by our previous finding that exigent circumstances did not exist. The police were entitled to maintain the status quo even though "there was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant." *Segura*, 468 U.S. at 809, 104 S.Ct. at 3387 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978)).

Finally, the duration of the seizure in this case did not render it unreasonable. A thirteen hour seizure is a lengthy intrusion. However, this intrusion must be considered in context. It commenced at approximately midnight, and concluded with the warranted search at approximately 1:00 the following afternoon. For most of those thirteen hours "it is reasonable to assume that judicial officers are not readily available for consideration of warrant requests." *Segura*, 468 U.S. at 812–13, 104 S.Ct. at 3389. It is also reasonable to assume that Hill spent the balance of the delay preparing a complete and accurate affidavit and presenting it to the judicial officer who issued the warrant. There is no evidence

that Hill purposely delayed this process in an exercise of bad faith. *See id.* at 813, 104 S.Ct. at 3389.

Because we have found that the hotel rooms and their contents were not unreasonably seized during the warrantless entry, the pertinent question becomes whether items were nonetheless tainted by that entry. In *Segura* the items at issue were held to be not tainted "because there was an independent source for the warrant under which the evidence was seized." *Id.* at 813–14, 104 S.Ct. at 3390. Accordingly, we will now turn our focus on the search warrant.

### 2. *Warranted Search—Overbreadth*

Appellants' first challenge to the search warrant concerns the particularity requirement of the Fourth Amendment:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no Warrants shall issue, but* upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched, and the persons or things to be seized.*

U.S. Const. amend. IV (emphasis added). The purpose of the particularity requirement is to make general searches impossible. *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The evil to be prohibited is the "exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed. 2d 627 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)).

■ The Supreme Court has stated on numerous occasions that the warrant must leave the executing officers no discretion as to what items are to be seized. *See, e.g., Andresen*, 427 U.S. at 480, 96 S.Ct. at 2748;

*Stanford v. Texas*, 379 U.S. 476, 486, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965); *Marron*, 275 U.S. at 196, 48 S.Ct. at 76. However, the warrants' description of items need only be " 'reasonably specific rather than elaborately detailed.' " *United States v. Storage Spaces Designated Nos. 8 & 49*, 777 F.2d 1363, 1368 (9th Cir.1985), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987) (quoting *United States v. Brock*, 667 F.2d 1311, 1322 (9th Cir. 1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d (1983)). " '[T]he degree of specificity required is flexible and may vary depending on the circumstances and the type of items involved.' " *United States v. Apker*, 705 F.2d 293, 299 (8th Cir.1983) (quoting *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir.1978), and citing *Roaden v. Kentucky*, 413 U.S. 496, 501, 93 S.Ct. 2796, 2799, 37 L.Ed.2d 757 (1973)); *see also United States v. Williams*, 687 F.2d 290, 293 (9th Cir.1982).

■ Appellants claim that each of the five lines of the warrant is over broad on its face.[3] The first two lines authorize the search for "any credit cards" and "any credit card drafts." Appellants argue that these two categories should have been limited to credit cards and drafts bearing names known to have been used in recent, local fraudulent transactions. We disagree.

Hill had probable cause to believe that Walsh was involved in a scheme of credit card fraud, and that Holzman was Walsh's accomplice. That Hill was aware of certain names used in certain fraudulent transactions did not foreclose the existence of probable cause to believe that other cards bearing other names had been used elsewhere and were present in the hotel rooms. Nothing in the record indicates that Hill possessed an exhaustive list of names and numbers from credit cards involved in the

---

**3.** The magistrate issued a warrant allowing the search and seizure of five categories of items. These categories were:

 1. Any credit cards under miscellaneous issuance names and account numbers.
 2. Any credit card drafts under miscellaneous issuance and names.

3. Any cash, jewelry, bonds and notes obtained through this fraud scheme, artifice and forgeries, etc.
4. Any miscellaneous identification cards used to commit fraud.
5. Any property or devices used or obtained through fraud operations.

scheme. Inclusion in the warrant of a partial, non-conclusive list of names would have provided appellants no additional protection from a general search. *Cf. United States v. Bright,* 630 F.2d 804, 812 (5th Cir.1980). Moreover, the circumstances of this case make it highly unlikely that any credit cards found in the rooms would be legitimately possessed by appellants. *See United States v. Cortellesso,* 601 F.2d 28, 32 (1st Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980). In the absence of complete and detailed knowledge on the part of the police, the magistrate was justified in authorizing the search for these generic classes of items. *See United States v. Hillyard,* 677 F.2d 1336, 1339–40 (9th Cir.1982) (citing *United States v. Cook,* 657 F.2d 730, 733 (5th Cir. 1981)).

██ Line three of the warrant authorizes the search for "any cash, jewelry, bonds and notes obtained through this fraud scheme." Appellants argue that the warrant provided insufficient guidance, making it impossible for the searching officers to determine which items were obtained through this or any fraud scheme. As a result, all cash, jewelry, bonds and notes were subject to seizure. Appellants' strongest authority is *United States v. Le-Bron,* 729 F.2d 533 (8th Cir.1984).

In *LeBron,* the court acknowledged that "courts generally approve warrants if they provide reasonable guidance to the exercise of informed discretion. Similarly, when it is impossible to describe the fruits of a crime, approval has been given to a description of a generic class of items." 729 F.2d at 536. But the *LeBron* court invalidated one portion of the warrant that authorized the search for "property believed to be stolen." The court explained that the language at issue was conclusory, non-descriptive, and did not constitute a generic classification. *Id.* at 537.

The language of line three is not as boundless as that in *LeBron.* It includes four definite types of property. Such use of generic classifications is precisely the practice which the *LeBron* court distinguished, and which has been found accept-

able by other courts. *See, e.g., Bright,* 630 F.2d at 811–12; *Cortellesso,* 601 F.2d at 30–32; *United States v. Scharfman,* 448 F.2d 1352, 1354 (2d Cir.1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972). Under the circumstances of this case, if probable cause existed to search for cash, jewelry, bonds, and notes (the issue of probable cause is discussed below), a more particular description would not have been possible. The police did not possess serial numbers for the cash in question, nor did they have time to develop a more exact description of the jewelry, bonds, and notes. As a result, we do not find line three to be over broad.

██ Line four of the warrant authorizes the search for "any miscellaneous identification cards used to commit fraud." Appellants challenge this description for the same reasons they challenged lines one through three. We find no material difference between the circumstances surrounding the search for credit cards and the search for identification cards. Because the police reasonably could not list all of the names included on cards used during the fraud, a generic description was sufficient guidance.

██ Line five of the warrant is more troublesome. It authorizes the search for "any property or devices used or obtained through fraud operations." Appellants argue that this language is the epitome of a general warrant. We agree. The quoted description is quite similar to the one we invalidated in *United States v. Whitten,* 706 F.2d 1000, 1014–15 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984) ("evidence of narcotics trafficking"), and the one invalidated by the Eighth Circuit in *LeBron,* 729 F.2d at 536–37 ("other property believed to be stolen").

The general, non-generic language of line five provides the searching officers with no reasonable guidance. The language does not limit the search to items readily identified with a particular transaction. Nor does the language provide any other objective guidelines to limit the scope of the officers' discretion. The necessary limita-

tion similarly cannot be divined from the language of the preceding lines of the warrant. That the property must have been obtained through fraud is insufficient to rescue line five from overbreadth.

Nevertheless, the invalidity of line five does not require the suppression of evidence in appellants' criminal trial. The constitutional error we have found was harmless. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed. 2d 705 (1967). None of the evidence seized from the hotel rooms must rely, for its admissibility, on line five. All of the seized items—bonds, traveler's checks, credit cards, identification cards, and drivers' licenses—are adequately described in lines one through four. Because we have found lines one through four sufficiently particularized, they may retain their validity while the invalid language of line five is severed from the warrant. *See United States v. Washington,* 797 F.2d 1461, 1473 (9th Cir. 1986); *United States v. Gomez–Soto,* 723 F.2d 649, 654 (9th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *United States v. Cardwell,* 680 F.2d 75, 78 (9th Cir.1982).

Appellants also contend that even if the warrant was sufficiently particular, it was executed in an over broad manner. First they argue that Arnold was unaware of the contents of the warrant or the objects of the search. Second, they argue that Hill had no authority to turn unseized items over to the custody of the hotel manager. We find these arguments unpersuasive.

■ The search of these adjoining hotel rooms was not unusually complex. Arnold, who had just spent the night securing the rooms from the inside, would be familiar with the area to be searched. Arnold also understood from Hill's briefing on the evening preceding the search that the case involved credit card fraud and that the scope of the warrant would include credit cards. In addition, Hill, the officer who made the arrests and obtained the warrant, was present and in charge during the term of the search. Under the circumstances, Arnold's lack of direct or indirect knowledge of the language of the warrant "did

not so taint this search as to convert it into a general rummage for evidence, and we therefore decline to order complete suppression on this basis." *United States v. Heldt,* 668 F.2d 1238, 1262 (D.C.Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).

Hill's decision to turn unseized items over to the custody of the hotel manager likewise was not unreasonable under the circumstances. Those personal belongings that remained unseized after the search were likely in disarray, considering the intensity of a search for items as small as credit cards and drafts. Hill was aware that appellants were in police custody and would not be returning to the rooms in the immediate future, and his failure to leave appellants' possessions strewn about two unoccupied hotel rooms represents a minor intrusion on appellants' possessory interests. On the other hand, it actually may have protected appellants' interests by decreasing or eliminating the risk of loss or damage.

3. *Warranted Search—Probable Cause*

Appellants' second challenge to the search warrant is that it was unsupported by the requisite probable cause when issued. "[A]ll data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Anderson,* 453 F.2d 174, 175 (9th Cir.1971); *United States v. Stanert,* 762 F.2d 775, 778 (9th Cir.1985). The affidavit must establish "a reasonable nexus between the item to be seized and the criminal behavior alleged." *Shaffer v. Wilson,* 523 F.2d 175, 179 (10th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).

Direct evidence linking criminal objects to a particular site is not required for the issuance of a search warrant. *United States v. Poland,* 659 F.2d 884, 897 (9th Cir.), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981). A magistrate need only determine that a fair probability exists of finding evidence, *United States v. Seybold,* 726 F.2d 502,

504 (9th Cir.1984), considering the type of crime, the nature of items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property. *United States v. Pheaster*, 544 F.2d 353, 373 (9th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977).

*United States v. Jackson*, 756 F.2d 703, 705 (9th Cir.1985).

The magistrate should consider the totality of the circumstances set forth in the warrant affidavit, *United States v. Moreno*, 758 F.2d 425, 427 (9th Cir.1985), and weigh the evidence presented in a non-technical, common sense, and realistic manner. *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331; *United States v. Crozier*, 777 F.2d 1376, 1380 (9th Cir.1985); *United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir.1983) (per curiam). In addition, the conclusions of the affiant based on experience and investigations may be considered. *Crozier*, 777 F.2d at 1380.

■ We do not review a magistrate's determination of probable cause de novo. *United States v. Alexander*, 761 F.2d 1294, 1300 (9th Cir.1985). That determination "should be paid great deference by reviewing courts[,]" *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590–91, 21 L.Ed.2d 637 (1969)); *Alexander*, 761 F.2d at 1300, and in close cases we should give preference to the validity of the search warrant. *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985). However, the magistrate must have a substantial basis for reaching a conclusion. *Moreno*, 758 F.2d at 427.

■ As discussed above, in connection with the legality of the warrantless entry, Hill had probable cause to believe that seizable items would be found in the hotel rooms. The facts set forth in the affidavit provided a substantial basis for the magistrate to reach that conclusion regarding the

crime of credit card fraud. Thus we are satisfied that probable cause existed to support the search for evidence of credit card fraud—*e.g.*, credit cards, credit card drafts, and identification cards. Also, because the affidavit described the large quantities of cash carried by appellants at the time of their arrest, and that counterfeit credit cards were being used to obtain cash advances, we are satisfied that probable cause existed to support the search for cash.

■ Notwithstanding, one portion of the warrant is troubling on the question of probable cause. Line three of the items to be seized includes the following language: "jewelry, bonds and notes obtained through this fraud scheme...." The government argues that the jewelry dealer and investment counselor business cards found on Walsh's person "produced the suspicion by Hill as to jewelry and bonds." We agree with the government insofar as the jewelry is concerned. However, if there was a nexus between the presence of an investment advisor business card and the existence of bonds and notes, that nexus was so tenuous and speculative that it could not have operated as a substantial basis for believing that bonds would be found.

■ Even if we were willing to accept the government's theory that the business cards supplied a reasonable basis to search for bonds, we would still have to invalidate that portion of the warrant that allowed the officers to search for the bonds. As we have stated, the data necessary to demonstrate probable cause for the issuance of a warrant must be "contained within the four corners of a written affidavit given under oath." *Stanert*, 762 F.2d at 778. Neither bonds nor notes were mentioned or discussed as part of the fraud scheme in the affidavit prepared by Hill for the issuance of the search warrant. Thus, under the facts of this case, the magistrate could not have had a substantial basis for concluding that probable cause existed to search for bonds.[4]

4. The evidence purported to justify the search

for bonds was so tenuous that no reasonable

*4. Warranted Search—Plain View*

██ However, our inquiry cannot stop here. The district court found that even if the bonds were not properly seized pursuant to the warrant, they were properly seized under the "plain view" exception to the warrant requirement. *See* Order at 8. Although appellants have not addressed "plain view" in their briefs, we consider it prudent and in the interest of justice to reach the issue at this time. *See* 16 C. Wright, A. Miller, E. Cooper, & E. Gressman, *Federal Practice and Procedure* § 3974 at 421–22 n. 1 (1977); *see also Smith v. Block,* 784 F.2d 993, 996 n. 4 (9th Cir.1986) (We may affirm a district court's decision on any ground finding support in the record); *cf Bruce v. United States,* 759 F.2d 755, 758 (9th Cir.1985) (If the district court's decision is correct, it must be affirmed, even if the district court relied on the wrong grounds or wrong reasoning).

Under certain circumstances, even though the search for a particular item is not warranted, it may be seized pursuant to the "plain view" doctrine. *See Coolidge,* 403 U.S. at 465, 91 S.Ct. at 2037. "An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Id.; see also Brown,* 460 U.S. at 735–39, 103 S.Ct. at 1539–42. The Court has applied the following standard: "the officers must be in a lawful position to view the items, the items must reasonably appear to be contraband or evidence of a crime, and the discovery must be inadvertent." *Brown,* 460 U.S. at 737, 103 S.Ct. at 1540; *Coolidge,* 403 U.S. at 466, 91 S.Ct. at 2038; *Washington,* 797 F.2d at 1468; *U.S. v. Chesher,* 678 F.2d 1353, 1356–57 (9th Cir.1982). We must determine whether the police properly seized the bonds pursuant to the "plain view" doctrine.

We first discuss whether the officers were in a lawful position to view the bonds.

Even though that portion of the warrant permitting a search for bonds must be invalidated the remaining portions of the warrant were supported by probable cause and remain valid. *Gomez–Soto,* 723 F.2d at 654; *Cardwell,* 680 F.2d at 78. Thus, it was proper for the officers to enter the rooms and search for those legitimately described items in those places where it was reasonable to believe they might be found. The record reveals that when Arnold began searching, he had not read the warrant, and he believed the search was directed at credit cards. During his search he discovered savings bonds in plastic bags in a corner of the hotel room. Clearly, it was reasonable for Arnold to conclude that the bags in which he searched might contain credit cards. Therefore, Arnold was in a lawful position to view the bonds.

Next we consider whether the bonds reasonably appeared to be evidence of crime. In *Washington,* 797 F.2d at 1468, local officers entered Washington's home with a search warrant authorizing the seizure of records depicting sales of cocaine. During the search, the officers set aside for federal agents documents that contained the names of three women who were known to be prostitutes working with Washington. Applying the "plain view" doctrine, we held that those names appearing on a document provided the probable cause necessary to associate the documents with criminal activity. *Id.* at 1469.

Like the situation in *Washington,* in this case the officers were aware that the names Joane and David Bauer, found on the bonds, were the same names that appeared on the false identification and credit cards discovered on Holzman and Walsh at the time of their arrest. Therefore, the bonds would reasonably appear to be evidence of a crime.

The remaining issue is whether the discovery of the bonds was "inadvertent" even though they were listed in the warrant. Seemingly, the officers would have

police officer could have believed that portion of the warrant was supported by probable cause. Therefore, the "good faith" exception to the valid warrant requirement, recognized in

*United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), cannot be applied to overcome this warrant's deficiency as to bonds. *See id.* at 923, 104 S.Ct. at 3421.

been searching for the bonds and their discovery could not have been inadvertent. However, to hold that items seized pursuant to an invalid portion of an otherwise valid warrant cannot be admitted under the "plain view" doctrine because of a failure to meet the inadvertence requirement would often place police officers between the horns of a dilemma. As noted by the Fifth Circuit in *United States v. Freeman*, 685 F.2d 942, 954 n. 7 (5th Cir.1982), an officer with a marginal case for probable cause to search for an item would have to decide whether to list the item in the warrant and preclude future reliance on "plain view" if that portion of the warrant is invalidated, or not to list the item in the warrant and risk suppression because the "plain view" seizure was not inadvertent. We find this result to be unacceptable.

Police officers should not be penalized for making a well-intentioned but partially unsuccessful resort to the warrant process. Rather, they should be encouraged to include in the warrant all items for which they believe there is probable cause to search. This is in keeping with the Fourth Amendment requirement of "Warrants ... particularly describing the place to be searched, and the persons or things to be seized." It is also consistent with the basis of the *Coolidge* plurality's adoption of the inadvertence requirement for "plain view." *See Coolidge*, 403 U.S. at 469–71, 91 S.Ct. at 2040–41. The only rational way to achieve this objective is to equate inadvertence for "plain view" purposes with lack of probable cause for purposes of issuing a search warrant. Thus, when an item is seized pursuant to a portion of a warrant invalidated for lack of probable cause, the discovery of that item is by definition inadvertent, and the "plain view" doctrine may apply. *See United States v. Winston*, 373 F.Supp. 1005, 1007 (E.D.Mich.1974); *see also* C. Whitebread, *Criminal Procedure* § 11.03 at 217–20 (1980) (and cases cited therein).

In the present case, Hill sought and obtained a warrant to search for, among other things, bonds. We have held that there existed insufficient evidence to establish probable cause to search for bonds. Therefore, the discovery was inadvertent for purposes of applying the doctrine of "plain view."

We have previously found that the other two prongs of the "plain view" analysis— that the officers were in a lawful position to view the bonds and that the bonds reasonably appeared to be contraband or evidence of a crime—have been satisfied. Thus, despite the lack of probable cause to support the warranted search for bonds, the seizure of the bonds could be justified under the doctrine of "plain view."

5. *Taint From the Unlawful Entry*

■ We have thus far determined that, apart from the initial unlawful entry of appellants' hotel rooms, all of the items seized during the warranted search were properly seized pursuant to valid portions of the warrant, or, in the case of bonds, pursuant to the doctrine of "plain view." We now complete our analysis by considering whether the warranted search was improperly tainted by the circumstances of the initial unlawful entry. If the justification for the warranted search was genuinely derived from a source independent of the unlawful entry, then the items seized under the warrant need not be suppressed. *See Murray v. United States*, — U.S. —, 108 S.Ct. 2529, 2533–34, 2535–36, 101 L.Ed. 2d 472 (1988); *Segura*, 468 U.S. at 804–05, 813–14, 104 S.Ct. at 3385–86, 3389–90.

In *Segura*, the Court stated that "our cases make clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." 468 U.S. at 815, 104 S.Ct. at 3391. Thus, if the warranted search would still have happened had the unlawful entry never occurred, then the items properly seized during the warranted search were admissible at appellants' trial. An analytical framework was recently provided in *Murray*. There the Court stated that the "independent source" doctrine would not apply, and the evidence would not be admissible, "if the agents' decision to seek

the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." 108 S.Ct. at 2535–36 (footnote omitted).

From our prior discussions of probable cause, it is clear that information obtained during the unlawful entry was not presented to the judge in this case, and did not influence her decision to issue the warrant.[5] It is not so clear, however, whether Hill's decision to seek the warrant was prompted by his observations during the unlawful entry. We do not imply that the record indicates that Hill would not have decided to seek the warrant had he not entered the hotel rooms on the evening of December 19, 1983. Rather, we find the record does not provide an adequate basis to resolve this important question. Accordingly, it is necessary that this case be remanded with instructions that the district court consider generally, whether the warrant issued was derived from a source independent of the prior unlawful entry, and specifically, whether Hill would have sought the warrant had he not made the unlawful entry.

## III

### CONCLUSION

To summarize our decision, we have found no constitutional violation in the investigatory detention, arrest, and search incident to the arrest of Holzman. We therefore affirm the district court's denial of appellants' motion to suppress the evidence obtained as a result of those police procedures.

We have found that the warrantless entry of appellants' hotel rooms was not justified by exigent circumstances and therefore was violative of appellants' Fourth Amendment privacy interests. However, no evidence was obtained as a direct result of the unlawful entry, and if it was effectively seized during that thirteen-hour period, such seizure was not unreasonable.

Evidence from the hotel rooms was obtained as a direct result of those lines of the search warrant which we have found not to have been over broad either on their face or in their execution. Moreover, with the exception of the bonds, the evidence was seized pursuant to a warrant which was supported by probable cause, while the bonds were properly seized under the doctrine of "plain view." Nonetheless, we must remand the case so that the district court may determine, in accordance with *Segura* and *Murray*, whether the evidence seized during the warranted search was tainted by the prior unlawful entry. To facilitate the remand, we vacate that portion of the district court's denial of appellants' motion to suppress relating to the challenged evidence seized during the warranted search.

AFFIRMED in part, VACATED in part, and REMANDED.

---

5. Appellants argue that because the independent evidence of bonds was virtually nonexistent, the inclusion of "bonds" in the affidavit must have derived from observations made during the unlawful entry, and obviously influenced the judge's decision to authorize a search for bonds. Whatever the merit of this argument may be, it has become irrelevant. We have held above that reference to bonds must be severed from the warrant, but that the bonds had been properly seized under the "plain view" doctrine. Consequently, the focus must now be on the remaining portions of the warrant in their capacity as a vehicle for application of the "plain view" doctrine to the seized bonds. If those portions of the warrant were tainted by the unlawful entry, then the search was tainted, as were all items seized during it, including the bonds.