UNITED STATES of America,
Plaintiff–Appellee,

v.

Hector Martin RAMOS,
Defendant–Appellant.

No. 89–50242.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 30, 1990.

Decided Jan. 17, 1991.

Abby Besser Klein and Stanley I. Greenberg, Los Angeles, Cal., for defendant-appellant.

John L. Carlton, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before NELSON, BRUNETTI and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

Hector Ramos challenges the constitutionality of his conviction for two narcotics offenses and his sentences on those counts. Because we find that Ramos' constitutional rights were not violated by the search of his apartment or by imposition of his sentences, we affirm the district court.

I

In the early morning hours of September 7, 1988, officers from the Torrance Police Department obtained a warrant for the search of 21925 Claretta Avenue, apartment No. 6, Hawaiian Gardens, where the Ramos family resided. Searches of Ramos' and others' residences and vehicles and the arrests of seven suspects, including Hector and Denise Ramos (Hector's wife), culminated an investigation into an alleged narcotics ring operating in the Los Angeles area. Hector Ramos now appeals his convictions and sentences on charges stemming from that investigation.

The events which led to Ramos' current incarceration require a careful recounting.[1] Following a tip, police officers began to watch the activities of occupants of and visitors to a house at 23303 Anza in Torrance, California. After several days of observation, in the evening of September 6 the police followed Manuel Suastegui as he left the Anza house. While following Suastegui, officers observed Anthony Del Vizo driving a van "in tandem" with Suastegui. Del Vizo drove to 13357 Ashworth, Cerritos, where he met Manuel Ibarra, left the van, and walked to a nearby gas station where Suastegui was waiting to drive him away.

After another man met with Ibarra and left with a package, Ibarra loaded Del Vizo's van with a box measuring three feet by two feet. Shortly thereafter, Hector Ramos appeared on the scene.[2] After a brief discussion with Ibarra, Ramos drove off in the van with the box.

Officers followed Ramos as he drove to 12234 Brittain, Hawaiian Gardens. Ramos drove in a counter-surveillance fashion; he circled the area, made U-turns, and frequently drove faster than the speed limit, yet occasionally pulled over to let traffic pass. At the Brittain house Ramos delivered the box from the van and then, twenty minutes later, drove off in the van with a passenger.

Ramos' next destination proved to be the apartment complex at 21925 Claretta, Hawaiian Gardens, where he arrived only after additional counter-surveillance driving. After twenty minutes passed, during which Ramos was out of the officers' view, he again drove off in the van, this time back to Ibarra and the Ashworth residence. Officers noted that the van seemed to ride lower in the rear, as if it were loaded with cargo, and that Ramos no longer drove in a counter-surveillance manner but instead proceeded cautiously, obeying all traffic laws. Back at the Ashworth house, Ramos left the van, met with Ibarra, and then departed in his own vehicle.

Officers later arrested Del Vizo, who had retaken possession of his van, and Suastegui, who was driving in tandem with Del Vizo in a separate vehicle. The arresting officers discovered that the cargo weighing down the van was 104 kilograms of cocaine.

Running a check on the various vehicles observed during the course of their surveillance, the investigating officers discovered

1. In *United States v. Del Vizo,* 918 F.2d 821 (9th Cir.1990), we described the arrest of two of Ramos' associates in this enterprise and the contemporaneous seizure of a large quantity of cocaine.

2. As will be discussed in more detail anon, Ramos was not identified until much later in the tale and was not named in the affidavit supporting the search warrant now challenged in this court. Ramos and his observed activities were described in the affidavit, however.

that one of the vehicles involved in the transaction was Hector Ramos'; they also learned that Ramos lived in apartment No. 6 at 21925 Claretta. The police obtained a search warrant for Ramos' apartment, including a storage area in the garage or carport. Upon executing the warrant hours before sunrise on September 7, police discovered approximately fifty-nine kilograms of cocaine in the residence and storage areas and $186,000 in cash in the box which officers had observed being placed in the van.

Ramos and six co-defendants subsequently were indicted on seven counts of various narcotics offenses. Ramos pled not guilty to all counts at his arraignment.

Ramos later moved to suppress the evidence collected during the search of his apartment, asserting that the search warrant was not supported by probable cause and that the so-called "good faith" exception did not validate the search. Ramos also contended that the officers who executed the search did not comply with the knock-notice requirements of 18 U.S.C. § 3109. The suppression motion was denied following an evidentiary hearing.

Pursuant to a plea bargain arrangement, Ramos filed conditional guilty pleas[3] on two counts on January 4, 1989. He moved to withdraw the pleas on March 15; that motion was denied. Pursuant to the federal sentencing guidelines, Ramos was sentenced to 211 months' incarceration on one count[4] and sixty months' on the other,[5] the sentences to be served concurrently, and fined $5,000.[6] A judgment of conviction was entered on April 4, 1989, and the other five counts were dismissed upon the government's motion.

Ramos timely appeals the denial of the suppression motion, the denial of the motion to withdraw the guilty plea, and the district court's application of the federal sentencing guidelines. We have jurisdiction under 28 U.S.C. § 1291.

## II

As he did before the district court, Ramos here asserts that the search of his apartment and storage area violated his rights under the fourth amendment.[7] Ramos offers two justifications for exclusion of the evidence obtained during the purportedly unconstitutional search. First, Ramos argues that the warrant granting the police authorization to search his apartment and storage area was unsupported by probable cause, and that the officers' reliance on the warrant did not fall within one of the exceptions to the exclusionary rule. Second, Ramos contends that the police failed to comply with the federal knock-notice statute when executing the warrant, which in itself, Ramos urges, justified exclusion of the evidence uncovered during the search.

We review the district court's decision to deny the motion to suppress *de novo*. *United States v. Thomas*, 844 F.2d 678, 680 (9th Cir.1988).

## A

The district court concluded alternatively that (1) the search warrant was based on probable cause, or (2) if there were insufficient facts to establish probable cause, the officers executing the war-

---

3. *See* Fed.R.Crim.P. 11(a)(2). Ramos reserved his right to seek review of the denial of the suppression motion.

4. This count charged Ramos with possession of over 50 kilograms of cocaine with intent to distribute. *See* 21 U.S.C. § 841(a)(1) (1988).

5. The second count charged Ramos with conspiracy to launder narcotics proceeds. *See* 18 U.S.C. §§ 371, 1956(a)(1) (1988).

6. The fine was imposed pursuant to the conviction for possession of cocaine with intent to distribute. Ramos was also sentenced to five years' supervised release on the possession count and three years' supervised release on the money-laundering count, again to be served concurrently.

7. The amendment reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

rant were acting in the good faith belief that they had a valid warrant.[8] We examine these conclusions in turn.

### 1

■ Ramos claims that the search warrant for his apartment and storage area was not based upon probable cause because it failed to show a nexus between the criminal activity and the places to be searched. On review we determine whether the issuing magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. *See Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983); *United States v. Rodriguez*, 869 F.2d 479, 484 (9th Cir.1989) (quoting *Gates*). Applying these standards,[9] we agree with Ramos that the warrant was not supported by probable cause.

■ Probable cause to justify a search warrant exists when there is a sufficient showing that incriminating items are located on the property to which entry is sought. *See United States v. Rabe*, 848 F.2d 994, 997 (9th Cir.1988); *United States v. Flores*, 679 F.2d 173, 175 (9th Cir.1982), *cert. denied*, 459 U.S. 1148, 103 S.Ct. 791, 74 L.Ed.2d 996 (1983); P. Polyviou, *Search & Seizure* 97 (1982). Probable cause to believe that a suspect has committed a crime is not by itself adequate to secure a search warrant for the suspect's home. *Id.* There must exist reasonable cause to believe that the things listed as the objects of the search are located in the place to be searched. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S.Ct. 1970, 1976, 56 L.Ed.2d 525 (1978).

■ The search warrant affidavit for Ramos' apartment, storage area, and truck describes in detail the activities of a number of suspects and other individuals. Ramos is not named in the affidavit, as the investigating officers had not identified him at the time. However, Ramos is described in the affidavit as an "unidentified male Latin[ ] wearing a green shirt and tan hat." The assertions in the affidavit concerning Ramos and his residence are simply that: (1) he drove up to the Ashworth residence in a pick-up truck, spoke with another, and drove off in the van in a counter-surveillance manner; (2) he arrived at the Brittain residence and unloaded a box which had been placed in the van by another;[10] (3) he and another man drove the van to the Claretta apartments;[11] (4) after twenty minutes, he drove the van back to the Ashworth house, where he left the van and drove off in the pick-up; and, (5) the pick-up was registered to him, it was parked at the Claretta address, and there

---

8. Lamentably, the district court's findings of facts and conclusions of law were merely a wholesale adoption of the findings and conclusions drafted by the government. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 615 n. 13, 94 S.Ct. 2856, 2866 n. 13, 41 L.Ed.2d 978 (1974) (criticizing the practice of adopting the prevailing party's findings and conclusions). " 'Indeed, the court merely crossed out the word "proposed" in entering the challenged findings.' " *United States v. Del Vizo*, 918 F.2d 821, 824 n. 4 (9th Cir.1990) (quoting *Alvernaz Farms, Inc. v. Bank of California (In re T.H. Richards Processing Co.)*, 910 F.2d 639, 643 n. 2 (9th Cir.1990)). In such circumstances, we review the district court's findings and conclusions with special scrutiny. *Id.*

9. While we review the district court's conclusion that there was probable cause to search the apartment with special scrutiny, *see supra* note 8, we accord a more deferential review to the determination of probable cause made by the state superior court judge who originally issued the warrant. *See United States v. Terry*, 911 F.2d 272, 275 (9th Cir.1990); *United States v. Holzman*, 871 F.2d 1496, 1511 (9th Cir.1989).

10. The portion of the affidavit's "statement of probable cause" concerning this transaction reads as follows: "[A]t 12234 Brittian [sic] in Hawaiian Gardens[,] [t]he white Plymouth Voyager was then driven partially down the driveway and parked at which time the driver [Ramos] exited the vehicle and carried into the residence, a three-foot square white box."

11. That portion of the affidavit reads as follows: "At approximately 2000 hours this same male Latin [Ramos], accompanied by another unidentified male Latin, then entered the white Plymouth Voyager and drove to 21925 Claretta in Hawaiian Gardens. After approximately 20 minutes your affiant's fellow officers observed the white Plymouth Voyager leaving the area being driven by the previously observed male Latin wearing a green shirt and tan hat [Ramos]."

was a mailbox there with the name "Ramos" on it.[12]

The affidavit contains no facts making it likely that anything the officers sought was present in the Claretta apartment. There are no allegations of anything being transported between the van and the apartment, or indeed that anybody from the van even entered the apartment. The only allegation involving Ramos and the transfer of property is that the man clad in the green shirt and tan hat was observed taking a box from the van into the Brittain house. There is no mention of cargo being loaded into, or observed within, the van at any point during Ramos' stewardship of the vehicle, or that the van was driven any differently after it left the Claretta or Brittain residences than it had been driven before, or even that Ramos was actually implicated in the enterprise and may be stashing drugs, money, or evidence at his apartment.

Most illustrative is a comparison of this case to *United States v. Rodriguez,* 869 F.2d 479 (9th Cir.1989), in which we found probable cause to search the residences of two men (Kevin Martin and Victor Rodriguez) observed taking possession of, transporting, and unloading cocaine.[13] In *Rodriguez,* probable cause arose to support the search of Martin's house because large boxes which had been loaded into a van driven by the men were no longer visible after the van left the house, presenting "a substantial basis to conclude that the boxes had been left at Martin's residence." *Id.* at 484. Other evidence established that the boxes likely contained a large quantity of cocaine. *See id.* at 484–85. In affirming probable cause for the search of Rodriguez' house, we stated:

> The proximity of the two houses does not, by itself, implicate Rodriguez' residence. However, the affidavit states that the van was stopped, after its departure from Martin's garage, within one block of Rodriguez' residence, and that Rodriguez and Martin declared that such was their destination. Additionally, cocaine had been discovered on Rodriguez' person and his Buick had played an integral part in the suspected criminal behavior.

*Id.* at 485.

Despite some superficial similarities between *Rodriguez* and the case at bar, we find the differences significant. For example, the police in *Rodriguez* knew that the searched place was the defendants' destination, *see id.,* whereas the affidavit in this case does not indicate that anyone involved in the narcotics operation lived at the Claretta apartments or that anyone in the van which parked at the apartments was observed going into any of the units. The affidavit in this case, unlike that in *Rodriguez, see id.* at 481–82, does not indicate that the van appeared to carry cocaine or any other such evidence at the time or after it visited the Claretta address.[14]

**12.** Rather inappropriately, the affidavit's boilerplate recitations include the remark that "[t]he vehicles driven by the Colombian cocaine trafficker are generally purchased in cash and the registered owner not properly transferred over, resulting in the registration information still being in the same name of the previous owner." To the extent this statement indicates that the registered owner of the pick-up, Ramos, was more likely a previous owner than one of the drug traffickers, it hardly supports the government's efforts below and now to maintain that the registration of the truck helped establish probable cause to search Ramos' home.

**13.** The facts of *Rodriguez,* briefly, were as follows: Surveillance of a suspected drug ring led police to tail a van and pick-up which were driven to a taco stand, the van loaded with two large cardboard boxes. The drivers of each vehicle met with Victor Rodriguez and Kevin Martin. Martin drove off in the van, followed by Rodriguez in a Buick. They drove to Martin's residence, where the van was parked in a garage. The two were arrested later when they drove away, with Martin driving and Rodriguez now a passenger; the van no longer held the cardboard boxes. 869 F.2d at 481.

**14.** On the contrary, the affidavit indicates only that when Ramos took possession of the van, it was loaded with a three-foot box covered in white plastic. The affidavit does not suggest what might have been in the box or whether it could have contained narcotics (in fact, it was later found to contain money). The officers observed Ramos deliver this box to the Brittain house before he moved on to the Claretta apartments; although that box subsequently was discovered by the officers searching Ramos' apartment, there is no indication in the affidavit that

Also, Rodriguez was arrested with cocaine in his possession while admittedly about to enter his house, *see id.* at 481, 485, whereas Ramos had not been arrested or even identified before the search warrant was issued and Ramos had not been seen (so far as the judge issuing the warrant knew) with any boxes which the police suspected could have contained cocaine; Del Vizo and Suastegui, who were arrested with cocaine, had not been anywhere near the Ramos apartments.[15]

We find no basis in the affidavit supporting the warrant for the conclusion that there was probable cause to believe that drugs or any other evidence would be discovered in Ramos' apartment or storage area. We cannot agree with the district court's first stated ground for denying the motion to suppress evidence.

### 2

■ The usual remedy for a violation of the fourth amendment is exclusion of the evidence obtained as a result of that violation. *See generally* 1 W. LaFave, *Search & Seizure* § 1.1 (2d ed. 1987) (describing the origins and purposes of the exclusionary rule). When officers act in reasonable reliance on a search warrant issued by a neutral magistrate but ultimately found to be invalid, however, evidence seized pursu-

ant to the warrant should not be suppressed. *United States v. Leon,* 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984); *United States v. Michaelian,* 803 F.2d 1042, 1046 (9th Cir. 1986). Whether the good faith exception to the exclusionary rule applies to a particular challenged search is a matter appropriate for *de novo* review by this court. *See United States v. Hove,* 848 F.2d 137, 139 (9th Cir.1988).

The district court held that the good faith exception applied to the search of Ramos' apartment and storage area, even if there was no probable cause to justify the searches. We agree with the district court.

■ When a search warrant is facially deficient, the *Leon* exception will not apply to stave off the exclusionary rule. *See, e.g., Center Art Galleries–Haw., Inc. v. United States,* 875 F.2d 747, 752–54 (9th Cir.1989) (police cannot "reasonably" rely on a facially overbroad warrant); *United States v. Stubbs,* 873 F.2d 210, 212 (9th Cir.1989) (same). We are presented with an entirely different case, however, when the warrant appears perfectly valid on its face, but lacks the foundation of a sufficient affidavit.[16]

---

Ramos still had the box when he travelled there or that he unloaded anything while there. Furthermore, although the officers later testified that the van appeared to hold cargo when it left the Claretta address, that they believed the cargo to be narcotics, and that Ramos drove in a more cautious manner once he left his residence, none of these observations are reflected in the affidavit.

**15.** *Compare United States v. Terry,* 911 F.2d 272, 274–76 (9th Cir.1990) (upholding search warrant where truck laden with controlled substances was stopped after leaving searched residence and where affidavit included drug agent's statement that in his experience methamphetamine traffickers usually keep money, records, and drug paraphernalia on their persons, in their residences, or in attached structures) *and United States v. Flores,* 679 F.2d 173, 174–75 (9th Cir.1982) (probable cause to search apartment for evidence of defendant's possession of the premises and of firearms established by affidavit which stated *inter alia* that defendant had been arrested in apartment, that evidence of

firearm possession had been observed in apartment by police officers and in adjoining storage areas by an informant, and that gunshots had been heard in area), *cert. denied,* 459 U.S. 1148, 103 S.Ct. 791, 74 L.Ed.2d 996 (1983) *with United States v. Hove,* 848 F.2d 137, 139 (9th Cir.1988) (where affidavit accompanying search warrant merely listed address to be searched but contained no information linking suspect or criminal activity to the address, district court's conclusion that there was no probable cause not challenged on appeal). *See also United States v. Hendricks,* 743 F.2d 653, 655–56 (9th Cir.1984) (discussing cases from other circuits in which affidavits failed to establish link between places to be searched and criminal activity), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985).

**16.** Ramos does not contend that the warrant was based upon falsehoods in the affidavit, or that the police had knowledge that the issuing magistrate had abandoned his judicial role. *See Michaelian,* 803 F.2d at 1046 (citing *Leon*). *See generally* 1 W. LaFave, *supra,* § 1.3(f), at 63–66.

In *Hove*, we declined to apply the *Leon* good faith exception to a search conducted under the authority of a facially valid search warrant. In that case, the affidavit accompanying the warrant and listing the address to be searched contained no information linking the suspect or any criminal activity to that address. 848 F.2d at 138–39.[17] The affidavit was so deficient, we held, that "any official belief in the existence of probable cause must be considered unreasonable." *Id.* at 139. The affidavit "offer[ed] no hint as to why the police wanted to search this residence." *Id.* at 139–40.

In contrast to the situation presented in *Hove*, here the affidavit supporting the search warrant clearly linked Ramos' apartment complex to the criminal enterprise observed by the officers. The van found to be laden with contraband had been parked at the complex for some minutes shortly before the seizure of its cargo. A truck carrying one of the van's drivers was registered to that address, was seen parked at the complex after the discovery of the cocaine, and was registered to a person whose name appeared on the apartment building's mailbox. While the affidavit supporting the Ramos search warrant may not have been the model of thoroughness, it cannot be said that the document "d[id] not link this location to the defendant." *See id.* at 140.

In *United States v. Holzman*, 871 F.2d 1496 (9th Cir.1989), we concluded that probable cause had been established to support the search of hotel rooms for evidence of credit card fraud and cash upon the arrest of the rooms' occupants. *See id.* at 1511. However, we held that there was no probable cause to support the warrant's specification of "bonds and notes" as items to be seized, in that "[n]either bonds nor notes were mentioned or discussed as part of the fraud scheme in the affidavit prepared by [the affiant] for the issuance of the search warrant." *Id.* Although the government argued on appeal that the discovery of an investment advisor business card on one of the arrested suspects suggested the possibility of bonds and notes, "that nexus was so tenuous and speculative that it could not have operated as a substantial basis for believing that bonds would be found" even if the connection had been " 'contained within the four corners of [the] written affidavit.' " *Id.* (purportedly quoting *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir.), *amended*, 769 F.2d 1410 (1985)). Not only did the judge lack a substantial basis for concluding that probable cause existed to search for bonds, *see id.*, but

> [t]he evidence purported to justify the search for bonds was so tenuous that no reasonable police officer could have believed that portion of the warrant was supported by probable cause. Therefore, the "good faith" exception to the valid warrant requirement, recognized in [*Leon*], cannot be applied to overcome this warrant's deficiency as to bonds.

*Id.* n. 4.

Again, the situation facing the police officers who searched Ramos' apartment differed significantly. The *Holzman* affidavit was silent on the justification for searching for bonds or notes, and it was hardly reasonable for the searching officers to believe that they would find such just because an investment counselor's business card had been discovered on the person of one of the culprits. In contrast, the officers in the instant case knew that Ramos' residence had been a stop-off point during a drug transaction, knew that a truck observed carrying one of the participants in the previous evening's events was parked at the address (indeed registered to that very address), and knew that a mailbox name at the address matched the registration name for the truck. Under these circumstances, the officers executing the warrant could have believed that there was probable cause to support the warrant.

Although probable cause was lacking, we conclude that the good faith exception ap-

---

**17.** In fact, the affiant police officer recited facts to a stenographer which would have established such a connection—namely, that he had observed a car belonging to the suspect and other indicia of her presence at the residence in question—but these statements were inadvertently left out of the final affidavit. *See id.* at 139.

plied to the search of Ramos' apartment and storage area under a facially valid search warrant.[18] It would have been inappropriate to apply the exclusionary rule to the evidence obtained during the search. On this ground, at least, Ramos' challenge to the denial of his suppression motion fails.

B

Ramos also contends that the police failed to comply with the knock-notice requirements of 18 U.S.C. § 3109 when they executed the search warrant. Ordinarily, the remedy for a violation of section 3109 mirrors that of a violation of the fourth amendment: the suppression of evidence garnered after the illegal police entry. *See United States v. DiCesare*, 765 F.2d 890, 895 (9th Cir.), *amended*, 777 F.2d 543 (1985). Ramos argues that the alleged violation of section 3109 here requires reversal of the denial of Ramos' motion to suppress evidence.[19]

■ The district court concluded that the police officers complied with the knock-notice requirement of 18 U.S.C. § 3109 in executing the warrant. In particular, the court found the testimony of all of the officers who testified to be credible. We review the district court's findings of historical facts for clear error, and its application of the appropriate legal principles *de novo*. *United States v. Kovac*, 795 F.2d 1509, 1513 (9th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987); *United States v. McConney*, 728 F.2d 1195, 1200–01 (9th Cir.) (*en banc*), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).[20]

■ Before a law enforcement officer may enter a building to execute a search warrant, he must give notice to the occupants of his official status and purpose, and be denied access. 18 U.S.C. § 3109 (1988). Ramos contends that the search team which arrived at his apartment in the pre-dawn hours of September 7 did not alert the occupants of the apartment to its presence before breaking into the apartment. The government does not dispute the assertion that they broke into the apartment, but contends that the officers fully complied with section 3109 and only forced their way in after their requests for admittance met with no response.

Each side presented evidence to the district court supporting its reconstruction of the events of that early morning. Police officers involved in the search testified that they broke into the apartment only after loudly knocking and announcing their purpose, at least twice, and after waiting approximately forty-five seconds. They testified that there was no response to their efforts to gain admittance peacefully. Ramos submitted the sworn written testimony of six neighbors who declared that they did not hear the police knock or announce their presence before everyone was roused by the forcible entry into apartment No. 6. Two of Ramos' witnesses testified that they were awakened by the sounds of footsteps proceeding up to the Ramos apartment, which were immediately followed by the break-in (and were not preceded by any knocking or announcements).

Chief Judge Real believed the police and discounted the testimony of Ramos' wit-

---

**18.** In *United States v. Weber*, 915 F.2d 1282 (9th Cir.1990), we noted that the time pressure under which an officer is operating when she prepares a warrant application may bear on whether an officer could rely in good faith on a warrant issued despite an omission in the affidavit. *See id.* at 1289. The officers who obtained the search warrant for Ramos' apartment generated a nine-page affidavit and executed the warrant in a matter of hours following the arrest of Del Vizo and Suastegui. Under the circumstances it is not entirely inscrutable that the affidavit failed to include some information which officers observed and which may have bolstered a finding of probable cause. *See supra* note 14.

**19.** Of course, violation of section 3109 does not necessarily lead to the exclusion of the evidence gathered during the offensive search. It is by no means certain that the protections afforded suspects by section 3109 exactly parallel those assured by the fourth amendment. *See United States v. Lockett*, 919 F.2d 585, 588–90 (9th Cir. 1990).

**20.** Again, we apply special scrutiny when reviewing government-prepared findings and conclusions. *See supra* note 8.

nesses, finding that the officers knocked on the Ramos apartment door twice before forcibly entering. He thus concluded that the officers had complied with section 3109.

■ Under the clear error standard, we are bound to accept a lower court's finding of fact unless we have a definite and firm conviction that a mistake has been committed. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948); *United States v. Silverman*, 861 F.2d 571, 576–77 (9th Cir.1988). Here, the district court valued the testimony of the police officers over that given by neighbors who admittedly were sleeping through some or all of the officers' initial attempts to enter the Ramos apartment and who could not see or (arguably) hear the events as clearly as the police. We give special deference to a trial court's credibility findings, even when that court adopts proposed findings verbatim. *See SEC v. Rogers*, 790 F.2d 1450, 1455 (9th Cir.1986), *questioned on other grounds, Pinter v. Dahl*, 486 U.S. 622, 650 n. 25, 108 S.Ct. 2063, 2080 n. 25, 100 L.Ed.2d 658 (1988); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 571–73, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985). The district court's findings of facts reveal no clear error. *Cf. United States v. Ruminer*, 786 F.2d 381, 382–84 (10th Cir.1986) (evidence at suppression hearing sufficient to support finding that officers waited five to ten seconds before entering after knock and announcement; in light of conflicting testimony, trial court was entitled to believe officers).

The district court correctly applied those facts to the law. While differing circumstances may play a large role in determining when the officers have made sufficient attempts under section 3109 to gain admittance without force, *see McConney*, 728 F.2d at 1206, the officers here seem to have been circumspect. A failure to answer a knock and announcement has long been equated with a refusal to admit the search party and a justification for forcible entry. *See, e.g., United States v. Allende*, 486 F.2d 1351, 1353 (9th Cir.1973) (refusal to admit may be implied by silence), *cert. de-*

*nied*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); *see also United States v. Jefferson*, 714 F.2d 689, 694 (7th Cir. 1983) (silence after two requests for entry justified break-in); *United States v. Williams*, 573 F.2d 348, 350 (5th Cir.1978) (silence despite indicia of presence in the home sufficient to justify break-in for execution of arrest warrant), *overruled on other grounds, Payton v. New York*, 445 U.S. 573, 575–76 & n. 4, 100 S.Ct. 1371, 1374–75 n. 4, 63 L.Ed.2d 639 (1980). The time interval before break-in of forty-five seconds was reasonable. *See, e.g., United States v. Phelps*, 490 F.2d 644, 646–47 (9th Cir.) (delay of ten to twenty seconds before forcing door open), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); *Allende*, 486 F.2d at 1353 (ten-second interval with no exigent circumstances except for scampering noises); *United States v. Woodring*, 444 F.2d 749, 751 (9th Cir.1971) (one-minute wait); *see also United States v. Ortiz*, 445 F.2d 1100, 1101–03 (10th Cir.) (approving forced entry after short wait although the warrant was served at a time allegedly chosen so that the building's occupants would likely be asleep), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971). *See generally Ruminer*, 786 F.2d at 384 (listing various intervals approved by reviewing courts). In fact, Ramos does not even argue that the police would not have been in compliance with the knock-notice statute had they announced their presence as testified to by the officers.

We agree with the district court that the police officers complied with section 3109 when they executed the search warrant at Ramos' apartment. Because the search of Ramos' apartment and storage area met the requirements for application of the good faith exception to the exclusionary rule, and because the searching officers complied with the federal knock-notice statute, the district court properly denied Ramos' motion to suppress evidence.

### III

Ramos contends that he should have been permitted to withdraw his guilty plea

on the ground that the plea was made without knowledge that the federal sentencing guidelines would apply and that he would be ineligible for parole. More particularly, Ramos notes that he entered the plea after the federal sentencing guidelines were ruled unconstitutional by this court, and before the United States Supreme Court declared the guidelines constitutional.[21] Ramos complains that the revival of the sentencing guidelines, which effected numerous substantive and procedural changes in the sentencing practices of the district courts within the circuit, rendered his earlier plea uninformed and unintelligent.

■ At the time Ramos entered his guilty plea, the district court was not obliged under Federal Rule of Criminal Procedure 11(c)(1) to advise Ramos of the applicability of the guidelines or that Ramos would be ineligible for parole on the conspiracy count. The rule with regard to parole eligibility was settled in *United States v. Sanclemente–Bejarano*, 861 F.2d 206 (9th Cir.1988) (*per curiam*), in which we specifically noted that Rule 11 had been amended in 1974 to overturn cases in which a duty to inform defendants of parole eligibility had been declared. *See id.* at 208–09 (quoting *Wayne v. Raines*, 690 F.2d 685, 688 n. 3 (9th Cir.1982), *cert. denied*, 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983)); *see also Doganiere v. United States*, 914 F.2d 165, 167 (9th Cir.1990) (quoting *Sanclemente–Bejarano*).[22] Moreover, we have held that a sentencing court did not err when it failed to inform a defendant of his ineligibility for parole under the sentencing guidelines. *See United States v. Marco L.*, 868 F.2d 1121, 1125 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989).

■ As to Ramos' more general contention, that Chief Judge Real should have informed him of the applicability of the sentencing guidelines themselves, it is clear that Rule 11(c)(1) did not expressly so require when Ramos pled guilty or when he was sentenced.[23] Even if we were to find such a requirement implicit in the former version of the rule, the district court's failure would not force a different result. Any deviations from Rule 11's strictures will be held harmless unless a substantial right is affected. Fed.R.Crim.P. 11(h); *see Sanclemente–Bejarano*, 861 F.2d at 210. A "substantial right" amounts to knowledge of the statutory maximum and minimum terms applicable to the relevant charges. *See id.; United States v. Jaramillo–Suarez*, 857 F.2d 1368, 1372 (9th Cir. 1988); *see also United States v. Fernandez*, 877 F.2d 1138, 1142–44 (2d Cir.1989) (Rule 11(c)(1) requires only notification of the statutory maximum and minimum). Ramos does not contend that he was not informed of the statutory maximum and

21. Our decision declaring the sentencing guidelines unconstitutional on separation-of-powers grounds was issued August 23, 1988. *See Gubiensio–Ortiz v. Kanahele*, 857 F.2d 1245 (9th Cir.1988). Ramos changed his plea to guilty on two counts on January 4, 1989. Exactly two weeks later, the United States Supreme Court ruled that the federal sentencing guidelines did not violate the separation-of-powers doctrine. *See Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Court then vacated *Gubiensio–Ortiz, see United States v. Chavez–Sanchez*, 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989), and upon reconsideration we remanded for resentencing under the guidelines, *see Gubiensio–Ortiz*, 871 F.2d 104 (9th Cir.1989).

22. We also note that although the sentencing guidelines effect fairly significant changes in the parole eligibility rules for federal defendants, the 1988 amendments to Rule 11(c)(1), while inserting reference to "supervised release" in order better to inform defendants of the consequences of a guilty plea under the guidelines, make no mention of any new requirement that defendants be informed of the changes in the parole eligibility rules. *See* 18 U.S.C.A. Fed.R. Crim.P. 11 advisory committee note, 1989 amendment (West Supp.1990). Thus, the commission appears not to consider the changes on parole eligibility a matter of mandatory disclosure. *See id.* ("The amended rule sets forth only the minimum advice that must be provided to the defendant by the court.").

23. Ramos pled guilty in January 1989 and was sentenced in April 1989. Some months later, Rule 11(c) was amended to require the sentencing court to inform defendants of the applicability of sentencing guidelines. *See United States v. Henry*, 893 F.2d 46, 49 n. 1 (3d Cir.1990) (discussing this change in Rule 11(c), effective December 1, 1989).

minimum terms for the charges to which he pled guilty.[24] Ramos knew when he pled guilty that he could be sentenced to a term as long as that he received, *see San-clemente–Bejarano,* 861 F.2d at 210; *Fernandez,* 877 F.2d at 1143, and thus he was not deprived of a substantial right.

■ This analysis is not affected by the retroactive application of the guidelines to Ramos' plea and sentence. We have already permitted the guidelines to be applied to pleas entered during the period between our decision in *Gubiensio–Ortiz* and the Supreme Court's decision in *Mistretta. See United States v. Kincaid,* 898 F.2d 110, 111 (9th Cir.1990); *cf. United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1052–53 (9th Cir.1990) (permitting retroactive application of the guidelines to crimes committed during the period of doubt between *Gubiensio–Ortiz* and *Mistretta* ). When Ramos pled guilty, he was on notice that the guidelines were part of a properly enacted statutory scheme and that the Supreme Court had already granted certiorari in *Mistretta. See id.* at 1053. This notice removes the possibility of "substantially inequitable results." *See United States v. Kane,* 876 F.2d 734, 736 (9th Cir.) (cited in *Gonzalez–Sandoval* and *Kincaid* ) (permitting government appeals of sentences rendered between *Gubiensio–Ortiz* and *Mistretta* ), *cert. denied,* —— U.S. ——, 110 S.Ct. 173, 107 L.Ed.2d 130 (1989). Thus, there was no unfairness in applying the guidelines to Ramos despite the different conditions which existed when he pled guilty; the plea cannot be considered uninformed or unintelligent.

■ The conclusion that the district court did not violate Rule 11 and that it was not improper to apply the guidelines to Ramos despite their earlier uncertain status does not fully dispose of Ramos' claim that the motion to withdraw the plea should have been granted. Under Federal Rule of Criminal Procedure 32, a trial court may permit withdrawal of a guilty plea before sentencing upon defendant's showing of any "fair and just" reason. Fed.R. Crim.P. 32(d). The change in the law might qualify as such a reason. We review the denial of a motion to withdraw a guilty plea for an abuse of discretion. *United States v. Read,* 778 F.2d 1437, 1440 (9th Cir.1985), *cert. denied,* 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986).

In the usual case, district court judges freely allow the withdrawal of guilty pleas before sentencing. *See, e.g., Read,* 778 F.2d at 1440; *Kadwell v. United States,* 315 F.2d 667, 670 (9th Cir.1963). However, there is no right to withdraw a guilty plea before sentencing. *United States v. Rubalcaba,* 811 F.2d 491, 493 (9th Cir.), *cert. denied,* 484 U.S. 832, 108 S.Ct. 107, 98 L.Ed.2d 66 (1987); *see also United States v. Rios–Ortiz,* 830 F.2d 1067, 1069 (9th Cir.1987) (same). After a co-defendant has been sentenced, an attempt to withdraw a plea "is akin to that of a defendant who seeks to withdraw his plea after sentencing." *United States v. Kay,* 537 F.2d 1077, 1078 (9th Cir.1976) (*per curiam* ). A guilty plea cannot be withdrawn after sentencing unless a manifest injustice would result. *See United States v. Baker,* 790 F.2d 1437, 1438 (9th Cir.1986); *see also United States v. Hoyos,* 892 F.2d 1387, 1400 (9th Cir.1989) (quoting *Kay* and applying "manifest injustice" standard to review of lower court's refusal to permit withdrawal of plea after sentencing of co-defendant but before sentencing of defendant seeking to withdraw plea), *cert. denied,* —— U.S. ——, 111 S.Ct. 80, 112 L.Ed.2d 52 (1990).

Although Hector Ramos attempted to withdraw his plea before he was sentenced, the request came only after the sentencing of his wife Denise and co-defendant Antho-

---

**24.** Ramos was sentenced to terms less than the maximum available for the charges. For the count charging conspiracy to launder narcotics proceeds, the maximum sentence available is a twenty-year prison term and a $500,000 fine. *See* 18 U.S.C. § 1956(a)(2)(B)(i) (1988). Ramos received a sentence of only five years in prison and three years of supervised release on this count. For the charge of possession of cocaine with intent to distribute, the maximum available sentence is life imprisonment and a $4,000,000 fine. *See* 21 U.S.C. § 841(b)(1)(A)(ii)(IV) (1988). Ramos received 211 months' imprisonment, five years' supervised release, and a $5,000 fine.

ny Del Vizo. No injustice is manifest to us. Permitting defendants to plead guilty to test the weight of potential punishment, and then to withdraw the plea if the sentence were unexpectedly severe, would "undermine respect for the courts and fritter away the time and painstaking effort devoted to the sentencing process." *Kadwell*, 315 F.2d at 670.[25] Under these circumstances, and bearing in mind that it is not our function "simply [to] substitute our judgment for that of the district court," *United States v. BNS, Inc.*, 858 F.2d 456, 464 (9th Cir.1988), it was not an abuse of discretion to deny the motion to withdraw the plea.[26]

## IV

Ramos attacks his sentences on two grounds. First, he argues that the federal sentencing guidelines under which he was sentenced violate the constitutional guarantee of due process of law because they inhibit individualized sentencing and because they permit sentences based upon facts not proven beyond a reasonable doubt. Ramos also argues that the guidelines were incorrectly applied to him, in that he was not given a two-point downward adjustment of his offense level for "acceptance of responsibility." We treat each of these arguments in turn.

## A

■ Ramos contends that the federal sentencing guidelines under which he was sentenced violate the due process clause of the fifth amendment.[27] We disagree.

Ramos first relies upon the decision in *United States v. Ortega Lopez*, 684 F.Supp. 1506 (C.D.Cal.1988) (*en banc*), which held that the guidelines unconstitutionally denied criminal defendants due process because they do not permit the trial courts adequate discretion to impose an individualized sentence. We rejected that court's conclusion in *United States v. Brady*, 895 F.2d 538, 542–43 (9th Cir.1990). *See also United States v. Sanchez*, 908 F.2d 1443, 1446 (9th Cir.1990) (following *Brady*).

■ Ramos' second ground for challenging the constitutionality of the sentencing guidelines is derived from *United States v. Davis*, 715 F.Supp. 1473 (C.D.Cal. 1989).[28] The *Davis* Court held that the sentencing guidelines violate due process because they permit a sentencing court to rely upon facts not proved beyond a reasonable doubt in determining the appropriate guideline level. *See id.* at 1477–78 (interpreting *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)). We rejected the *Davis* rule in *United States v. Wilson*, 900 F.2d 1350,

**25.** Ramos argues that the burden rests upon the government to establish the prejudice it would have suffered by a grant of the motion to withdraw the plea, particularly where Ramos made it clear that he was not seeking a trial but merely a reconsidered plea bargain, once Ramos advanced a "fair and just" reason to withdraw his plea. Assuming *arguendo* that Ramos presented such a claim and the government indeed shoulders said burden, the prejudice clearly lies in permitting criminal defendants two bites at the apple by striking plea bargains and then, once one defendant has been sentenced to an unexpectedly large term, having the co-defendants wriggle out of the deals.

**26.** In *United States v. Presley*, 478 F.2d 163 (5th Cir.1973), our sister circuit held that a decision interpreting a statute to which defendants had pled nolo contendere, issued after the pleas, could render those pleas unknowing or unintelligent; thus the district court's refusal to permit a withdrawal of the pleas was reversible error. *See* 478 F.2d at 166–68. In *Presley*, unlike here,

the new decision actually called into question the very applicability of the criminal statutes to defendants' conduct and the federal courts' jurisdiction over the matter. *See id.* at 167. Furthermore, the *Presley* Court was not faced, as we are, with the potential for abuse described in *Kadwell* of "testing the waters" and withdrawing the plea after a harsh sentence appears likely.

**27.** The amendment declares, in pertinent part, "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

**28.** Although Ramos did not raise his *Davis* argument before the district court, we consider the contention under our discretionary power to treat even new matters which are purely matters of law and which are important to the case and public. *See Yuckert v. Heckler*, 774 F.2d 1365, 1367 (9th Cir.1985), *rev'd on other grounds*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

1352–55 (9th Cir.1990), and we decline to resurrect it now. *See also United States v. Rafferty,* 911 F.2d 227, 231 (9th Cir.1990) (rejecting same claim).

Both of the arguments advanced by Ramos for the proposition that the federal sentencing guidelines violate the due process clause of the fifth amendment previously have been rejected by this court. Therefore, we conclude that application of the guidelines to Ramos' case did not deprive Ramos of the due process of law.

### B

■ Section 3E1.1 of the federal sentencing guidelines instructs a sentencing court to reduce a defendant's offense level by two points if it finds that he "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." Ramos argues that he was entitled to such reduction.

This court has determined that whether a defendant has accepted responsibility for his crime is a factual issue, subject to the clearly erroneous standard of review. *See United States v. Cooper,* 912 F.2d 344, 345 (9th Cir.1990) (citing *United States v. Gonzalez,* 897 F.2d 1018, 1019 (9th Cir.1990)); *see also* United States Sentencing Comm'n, *Guidelines Manual* § 3E1.1, commentary at 3.24 (Nov.1989) [hereinafter *Guidelines Manual*] (application note 5) ("the determination of the sentencing judge is entitled to great deference and should not be disturbed on review unless it is without foundation"). We conclude that the district court's refusal to grant Ramos a reduction was sufficiently founded and thus not clearly erroneous.

It is clear that section 3E1.1 does not require a reduction as a matter of right whenever a defendant pleads guilty. *Cooper,* 912 F.2d at 345; *Guidelines Manual* § 3E1.1(c); *see also Gonzalez,* 897 F.2d at 1020 (citing section 3E1.1, application note 3). Acceptance of responsibility requires some manifestation of "sincere contrition," *see Guidelines Manual* § 3E1.1, commentary at 3.23 (application note 2), or "sincere remorse," *see id.* at 3.24 (background).

Ramos asserts that his statement to the probation officer acknowledging that he stored drugs in his apartment and helped to count money was sufficient to establish his contrition. He argues that these admissions constituted acceptance of responsibility for the crimes to which he pled guilty. He further urges that requiring any additional admissions would have forced Ramos to confess to crimes to which he had not pled guilty.

In this circuit, a criminal defendant is entitled to a reduction for acceptance of responsibility under the guidelines even if he does not admit culpability for crimes to which he does not plead guilty. *See United States v. Piper,* 918 F.2d 839, 840–41 (9th Cir.1990) (per curiam) (surveying conflicting rules from other circuits and adopting this one). In this case, however, Ramos was not required or requested to confess to any of the other charged crimes. Rather, he was merely obliged to exhibit a sincere recognition of responsibility for his role in the two crimes to which he did plead guilty, conspiracy to launder money and possession of cocaine. Ramos' minimalist description of his involvement in the affair (two or three sentences) did not suffice, in the eyes of the probation officer or the district court, given evidence which suggested a much deeper involvement in the scheme. Since Ramos had an opportunity to augment his statements by letter or at the sentencing hearing of April 3, 1989, but did not, we cannot find that the district court's denial of the reduction was clearly erroneous.[29]

---

**29.** It might have been a different matter had Ramos been denied the opportunity to present evidence regarding his acceptance of responsibility. Ramos in effect makes this argument by attributing his reticence before the probation officer to his youth, lack of sophistication, and the language barrier (Ramos does not speak English, and communicated with the probation officer only through an interpreter). Nonetheless, the fact remains that Ramos failed to take the opportunities presented to him after the meeting with the probation officer to correct any misimpressions which may have arisen about his willingness to accept responsibility for his involvement in the crimes.

The district court's finding that Ramos had not affirmatively displayed an acceptance of personal responsibility for his criminal conduct was not clearly erroneous. Ramos was not entitled to a two-point reduction in his offense level under the sentencing guidelines.

## V

We perceive no ground upon which to reverse the lower court's decision. The district court correctly denied Ramos' motion to suppress evidence obtained at his Hawaiian Gardens apartment and storage area. The court did not commit reversible error in denying the motion to withdraw the guilty pleas or in refusing to grant Ramos a two-point reduction in offense level for acceptance of responsibility under the sentencing guidelines. Use of the guidelines did not deny Ramos due process of law.

AFFIRMED.