953 F.2d 1388
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Katherine F. GASPAR and Allen K. Gaspar, Defendant-Appellants.
 Nos. 90-10237, 90-10239, 90-10304 and 90-10297.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 5, 1991.
Decided Jan. 22, 1992.
 
 Before ALARCON, D.W. NELSON and CANBY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Katherine and Allen Gaspar were convicted of four drug related counts. Katherine Gaspar appeals from the judgment entered following her conviction on the basis that evidence used at trial was illegally seized from her residence. Allen Gaspar appeals from the denial of his motion to suppress evidence.
 
 
 3
 We affirm because we conclude that the district court did not clearly err in finding that (1) Allen Gaspar voluntarily consented to the entry into his home and that (2) the evidence seized from the Gaspars' bedroom was observed in plain view during a valid protective sweep. We also affirm the district court's finding that the Gaspars accepted responsibility for their acts.
 
 I. PERTINENT FACTS
 
 4
 We summarize the evidence in the light most favorable to the trial judge's decision on a motion to suppress. See United States v. Viento Lynn Childs, 944 F.2d 491, 492 (9th Cir.1991).
 
 
 5
 On August 17, 1989, at approximately 11:15 a.m., a confidential informant ("CI") advised the United States Marshal's Service that Carl Thomas, a fugitive, was residing at three houses in the Kailua area, moving periodically from one house to the other. At that time, a warrant for Thomas' arrest had been outstanding for nine months. One of the three houses, 317 B Olomana Street in Kailua, was owned by Katherine and Allen Gaspar. The CI reported that he had last seen Thomas at the Olomana Street house two days before. The CI observed several other individuals in the house at that time, as well as quanitities of narcotics and numerous weapons, including an Uzi submachine gun. The CI also noted that, at the time, Allen Gaspar seemed "paranoid" and walked around the house armed.
 
 
 6
 Neither the office of the U.S. Marshal nor the Honolulu Police Department had used this CI before. Because the CI's information corroborated earlier reports of Thomas' presence in the Kailua area, however, two marshals, Deputy Markle and another deputy, investigated the tip. The marshals met with the CI later that day, at approximately 1:00 p.m.. They had the CI take them to the two other residences in which, the CI had said, Thomas had lived. Seeing no activity at either of the two homes, the marshals and the CI went to the Olomana house. Shortly before 2:30 p.m., the CI agreed to enter the house to look for Thomas. When the CI walked out of the house at 2:30 p.m., he signaled to the marshals that Thomas was present.
 
 
 7
 At 3:30 p.m. three marshals and a Honolulu police officer approached a sliding glass door that appeared to serve as the main entrance. The officers knocked on the door and yelled "police." Inside the house, Allen Gaspar saw the officers and went to the door. The officers told Gaspar, "Come over, we want to talk to you." One of the officers, Officer Carreiro, moved forward, produced his badge, identified himself as a Honolulu police officer, and said that the officers were looking for Carl Thomas. Officer Carreiro had his gun drawn, but pointed down at the ground toward his back. Three or four of the other officers also had their guns drawn. Officer Carreiro did not ask Allen Gaspar to open the door.
 
 
 8
 Officer Carreiro testified that Allen Gaspar then grinned, opened the glass sliding door, and motioned him into the house, and looked in the direction of the living room. At the hearing on the defendants' motion to suppress, Officer Carreiro demonstrated the hand motion by making "a gesture with his hand at about waist level, with his palm facing him, and gesturing towards his own body." Once Gaspar had opened the sliding door, Officer Markle saw Carl Thomas standing in the living room before he stepped through the door. The officers immediately arrested Thomas. A large individual was observed walking down the hallway to the left of the living room. He was also detained.
 
 
 9
 While Thomas was being arrested, Officer Carreiro heard a door slam shut at the end of the hallway. Aware the CI had previously observed other individuals and weapons in the house, Officer Carreiro proceeded down the hallway to check the connecting bedrooms for other persons. Upon coming to a closed door at the end of the hallway, he requested entry. Katherine Gaspar opened the door slightly, entered the hallway, and shut and locked the door behind her. Suspecting that additional persons might be in the room and fearing for his safety, Officer Carreiro ordered her to open the door. She complied.
 
 
 10
 Upon entering the room, the officer saw cocaine, marijuana, and drug paraphernalia in plain view on the bed and floor. He entered the room and found no persons there. Meanwhile, another officer in the living room found small amounts of cocaine and marijuana in plain view on a coffee table. The officers seized this evidence and arrested Allen and Katherine Gaspar. They were taken to the Honolulu Police Department Substation in Kailua that afternoon. At the station, Officer Miranda asked for Katherine Gaspar's consent to a second search of her residence. He showed her a written consent-to-search form and then read it to her. Ms. Gaspar appeared calm and coherent when she signed the form. She is a high school graduate and said that she understood the rights described in the consent-to-search form.
 
 
 11
 Accompanied by Katherine Gaspar, the police returned to the house that evening to conduct a full search of the premises. Upon Katherine Gaspar's request, the police did not search the upstairs apartment which was inhabited by her mother. The officers seized additional illegal drugs, related paraphernalia, and a firearm. Later that evening, the Gaspars were released pending further investigation.
 
 
 12
 On December 7, 1989, a federal grand jury indicted Katherine and Allen Gaspar on federal narcotics charges. Arrest warrants were issued, and the Gaspars were arrested at their home on December 11, 1989. In the course of the arrests, the police found and seized a variety of objects in plain view, including marijuana and drug paraphernalia. On February 2, 1990, Judge Samuel Conti denied the Gaspars' motion to suppress the evidence seized during the three searches of their home.
 
 II. DISCUSSION
 
 13
 A. Allen Gaspar's Consent: the Hand Gesture
 
 
 14
 The Gaspars contend that the drugs found in the bedroom and living room during the first search should be suppressed because the officers entered the Gaspars' residence without their consent and without a search warrant. They argue that the district court clearly erred in finding, entirely on the basis of Officer Carreiro's testimony, that Allen Gaspar consented to the entry by making a hand motion. Appellants argue that Allen Gaspar's contrary testimony should have been credited or, if not, that the gesture described by Officer Carriero could not have signified an intention to enter.
 
 
 15
 A district court's factual findings regarding consent to search is entitled to great deference by this court and is generally reversible only if clearly erroneous. See Spain v. Rushen, 883 F.2d 712, 717 (9th Cir.1989), cert. denied, 110 S.Ct. 1937 (1990) (noting that the trier of fact has wide latitude in deciding which witnesses to believe or disbelieve). In cases of implied consent, however, where we determine "whether as a general rule certain types of actions give rise to an inference of consent, de novo review is appropriate." United States v. Shaibu, 920 F.2d 1423, 1425 (9th Cir.1990) (citation omitted). We need not decide which standard of review is applicable in this case, however, because we are satisfied that under either standard the district court correctly found that Allen Gaspar consented.
 
 
 16
 Gaspar testified that he paused for a minute before opening the door. The district court also credited Officer Carreiro's testimony that Gaspar grinned as he opened the door and turned to look at Thomas after motioning Carreiro into the house. These facts support a finding that Gaspar consented to the officers' entry. Credibility determinations by the district judge will not be overturned on appeal unless clearly erroneous. See Spain v. Rushen, 883 F.2d at 717. The record does not demonstrate that Officer Carreiro's testimony was so incredible or unsubstantial on its face that the district court clearly erred in crediting it. Our independent review of the record has persuaded us that Allen Gaspar consented to the entry by making a welcoming hand gesture, grinning at the officers, and looking towards Thomas.
 
 B. Allen Gaspar's Consent: Voluntariness
 
 17
 The Gaspars contend that even if this court finds that Allen Gaspar consented to the entry, the Government failed to bear its burden of showing unequivocal consent without duress or coercion. A district court's determination "whether consent to search was voluntarily made is a question of fact reviewed under the 'clearly erroneous' standard. Voluntariness is 'based on the totality of circumstances surrounding the giving of consent.' " United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir.1989) (citations omitted). The Government has the burden of showing " 'that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given.' There must be convincing evidence that defendant has waived his rights.... Coercion is implicit in situations where consent is obtained under color of the badge.' " Shaibu, 920 F.2d at 1426 (citation omitted).
 
 
 18
 Allen Gaspar contends that he opened the door of the house because a gun was pointed at him and because he was ordered to come over and talk to the police. Gaspar argues that his failure to resist does not signify consent and that this matter is controlled by our decision in Shaibu. In Shaibu, we were called upon to determine whether "retreating into one's home while being followed by a police officer can constitute consent to a police entry." Id. In Shaibu, the facts showed that the defendant met the police in the hallway, turned around, walked back into his apartment, and left the door open. Id. at 1424. We held that "in the absence of a specific request by police to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent." Id. at 1428. "In Shaibu's case, no affirmative acts took place. He opened the door not to let the police enter, but only for himself to step out of the apartment to meet visitors outside rather than inside. There is no contention that the police expressly or impliedly asked consent to enter nor that Shaibu granted or refused entry.' Id. at 1427 (emphasis added). We concluded in Shaibu that his failure to object to the entry was "more likely suggesting submission to authority than implied or voluntary consent." Id. In this matter, unlike the submissive behavior of the appellant in Shaibu, Gaspar expressly invited the officers to come in with a motion of his hand.
 
 
 19
 Officer Carreiro testified that he held his gun down at his side, pointed behind him. The other officers held their weapons in the same way. Allen Gaspar testified that Officer Carreiro pointed his gun at Gaspar through a living room window. The trial court disbelieved Gaspar's testimony and found that Officer Carreiro's weapon remained by his side. While the presence of drawn weapons may create a coercive atmosphere, it is not dispositive as to the voluntariness or involuntariness of a consent. See Castillo, 866 F.2d at 1082 (noting that of the several factors to consider in determining whether consent is voluntary, including whether officers have drawn their weapons, none of them is dispositive). The totality of the circumstances demonstrates that the fact that the officers drew their weapons did not coerce Gaspar into consenting to the entry.
 
 
 20
 C. Validity of the Protective Sweep: Evidence Seized from Bedroom in Plain View
 
 
 21
 Katherine Gaspar contends that the evidence seized from her bedroom during the first search was not in "plain view" because Officer Carreiro had exceeded the scope of his protective sweep. She also argues that Officer Carreiro testified that he could tell that no one was hiding there upon entering the room and, therefore, he should not have lingered in the room to view the contraband in plain view on the bed.
 
 
 22
 We have independently examined the record. We conclude that the district court did not err in finding that the protective sweep's scope was proper and that the evidence seized was in "plain view." See United States v. McConney, 728 F.2d 1195, 1204-05 (9th Cir.1984) (the presence of exigent circumstances is reviewed de novo ), cert. denied, 469 U.S. 824 (1984). Exigent circumstances permit officers to conduct a protective search when officers have arrested a person inside a residence and "the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." United States v. Gardner, 627 F.2d 906, 909-10 (9th Cir.1980) (footnote omitted).
 
 
 23
 The record in this case reveals " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]' " Officer Carreiro's warrantless search of the Gaspars' bedroom. United States v. Dugger, 603 F.2d 97, 99 (9th Cir.1979) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)). The CI informed the officers that additional people and weapons had been present in the house two days before. The presence of Thomas in the Gaspar's residence confirmed to the officers that the CI was a reliable informant. Officer Carreiro heard someone somewhere in the house slam a door shut while the officers were arresting Thomas. Officer Carreiro was clearly justified in believing that other persons who might be armed were present on the premises.
 
 
 24
 The record shows that, in determining that no one was in the Gaspars' bedroom, Officer Carreiro checked the closets, the floor, and between the bed and wall unit. The record amply demonstrates that the evidence found in the bedroom was discovered in plain view during a valid "protective sweep."
 
 
 25
 D. Appropriateness of the "Two-Point" Reduction for Acceptance of Responsibility
 
 
 26
 The Government appeals from the reduction of Allen and Katherine Gaspars' offense levels for acceptance of responsibility under the Sentencing Guidelines. See U.S.S.G. § 3B1.1 et seq. It contends that the district court had no basis in the record for finding that the Gaspars had clearly accepted responsibility for their actions. The Government argues that neither defendant accepted responsibility in their interviews with the United States Probation Office nor at trial. We review the district court's factual determination whether a defendant clearly demonstrates acceptance of responsibility for his or her criminal acts for clear error. United States v. Gonzalez, 897 F.2d 1018, 1019 (9th Cir.1990).
 
 
 27
 During the sentencing proceedings, Katherine Gaspar stated to the court: "all I can say is I'm sorry and I guess I just have to face the consequences, whatever is given to me." When asked by the court whether he accepted responsibility, Allen Gaspar replied: "I'm sorry for what I did."
 
 
 28
 This evidence demonstrates that the district court's reduction of the defendants' offense levels was "sufficiently founded." United States v. Ramos, 923 F.2d 1346, 1360 (9th Cir.1991). We are required to give "due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e). The district court's determination that the Gaspars accepted responsibility for their crimes was not clearly erroneous.
 
 
 29
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3