15 F.3d 1091
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Apolunio FELIX, aka: Apolonio Felix, Defendant-Appellant.
 No. 92-50525.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 7, 1993.
Decided Feb. 3, 1994.
 
 1
 Before: FLETCHER, D.W. NELSON, Circuit Judges, and WILL,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Appellant Apolunio Felix entered a conditional guilty plea to one count of conspiring to distribute and to possess with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 846 and 841(a)(1), and one count of using a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. Sec. 924(c). He appeals the district court's denial of his motion to suppress evidence, which was based on the purported unconstitutionality of a search warrant, a warrantless search, and his arrest. He also appeals the court's refusal to accept a guilty plea specifying the sentence to be imposed. The district court had jurisdiction under 18 U.S.C. Sec. 3231. We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 BACKGROUND
 1. The Search Warrant
 
 4
 The allegations leading to the issuance of a warrant authorizing the search of an apartment on Otis Avenue in Bell, California, are set forth in the Declaration of Richard Gutierrez, on which the warrant was based. Gutierrez described a week of police surveillance of appellant's co-conspirators, beginning with a tip from a confidential source, and culminating in the observation of a drug sale in progress and the arrest of several of the conspirators.
 
 
 5
 More specifically, Gutierrez stated that on January 6, 1992, he observed a person later identified as co-defendant Ortiz enter and exit a residence on Evergreen Avenue; that on January 7, 1992, he observed Ortiz making pager calls from a public phone and driving in a counter-surveillance manner to a residence on East 73rd Street; and that between January 7 and 12, he observed Ortiz meeting with persons at Albany Avenue after posting a lookout, and entering a residence, apparently alone, at Otis Avenue. Gutierrez stated that Ortiz appeared to be in control of both the 73rd Street and the Otis Avenue residences; that he entered those residences alone; and that he, Gutierrez, concluded that those locations were probably being used as safe houses for drugs or money.
 
 
 6
 The balance of the affidavit is devoted to the movements of Ortiz and several other co-defendants on January 14, 1992, the day of the arrest. On that day, Ortiz drove a black Mercury Marquis in a counter-surveillance manner from the Evergreen Avenue residence to the Albany location, and from there to the East 73rd Street residence. At 11 a.m., Ortiz left East 73rd Street in a red Cougar; as he drove to various unspecified locations he appeared to be checking for a tail. At 12:20 p.m., he reached the Otis Avenue apartment and parked his car in the attached garage. At 2:10 p.m., he exited the garage in a silver Toyota truck, in the company of two other men. They drove the truck to Benji's Auto Sales. Ortiz left Benji's at 3:20 p.m. in a blue vehicle which he drove in a counter-surveillance manner back to the Otis Avenue apartment. Just before he got there, the two men with whom he had driven to Benji's, later identified as defendants Javier Leon-Corrales and Cristino Jacobo, drove past the Otis apartment several times in a pickup truck; they finally parked west of Otis Avenue and walked to the apartment. Ortiz also parked on the street and walked to the apartment, which he entered through the front door.
 
 
 7
 At 4:30 p.m., Ortiz drove out of the Otis Avenue garage, this time in the red Cougar. Police followed the Cougar to D & D Liquor, in Los Angeles. At 5:30 p.m., and within approximately five minutes of one another, a Volvo, a Honda, and a BMW arrived at the same location. Police officers watched while Ortiz transferred a trash bag, apparently heavy, from the Cougar to the trunk of the Honda; they also watched the BMW driver look into the Honda's trunk and then display a bag of money to Ortiz. Concluding that they had just watched a drug sale, Gutierrez and fellow officers arrested all the participants. The officers observed a large amount of currency in the Cougar, and eight kilo-size packages of what looked like cocaine in the trunk of the Honda.
 
 
 8
 Based on the foregoing, Gutierrez sought authorization to search the Evergreen, Albany, East 73rd, and Otis Avenue locations. A search warrant was signed by a state court judge. At the Otis Avenue apartment, officers found 112 kilograms of cocaine and $385,000 in cash.
 
 2. Warrantless Entry and Arrest
 
 9
 After Ortiz had been arrested, but before the police had gotten the search warrant, officers went to the Otis apartment and knocked on the door, requesting entry. A person later identified as Felix appeared at the window. The officers ordered him at gunpoint to open the door; Felix did so, and they saw that he was armed with a .38 caliber semi-automatic pistol. They arrested Felix, seized his gun, and secured the apartment.
 
 
 10
 In district court, Felix filed a motion to suppress the gun, the drugs, and the money, based on the purported illegality of both the warrantless entry and arrest and the warrant search. He challenged both the form and the substance of the warrant, contending that Gutierrez' affidavit contained crucial factual inaccuracies. The motion was denied. Felix also requested a Franks hearing with respect to Officer Gutierrez' search warrant affidavit, but this too was denied.
 
 3. Plea Agreement
 
 11
 On May 1, 1992, appellant and co-defendant Ortiz attempted to enter guilty pleas. In the plea agreements, the government agreed to a specific sentence, an arrangement set forth in Fed.R.Crim.P. 11(e)(3)(C). The judge, however, advised counsel for Ortiz that in his court, Rule 11(e)(3)(C) guilty pleas were not accepted. On May 4 and 5, appellant and Ortiz reappeared and entered guilty pleas which omitted the Rule 11(e)(3)(C) sentencing agreement. The court subsequently sentenced appellant to 190 months in custody, a longer sentence than that agreed to in the first plea agreement.
 
 DISCUSSION
 1. Search Pursuant to Warrant
 
 12
 a. Probable cause
 
 
 13
 Appellant argues that the warrant which authorized the search of the Otis apartment was not supported by probable cause.[1] As noted above, appellant contends that Officer Gutierrez' affidavit contained various factual inaccuracies. The government has admitted to at least one such inaccuracy. In such cases, we look to the remainder of the affidavit to determine whether or not, without the inaccurate statements, the affidavit establishes probable cause. See United States v. Huguez-Ibarra, 954 F.2d 546, 551 (9th Cir.1992); United States v. Dozier, 844 F.2d 701, 706 (9th Cir.1988), cert. denied, 488 U.S. 927 (1988). Our review of the district court's probable cause determination is de novo. Id.
 
 
 14
 In order to establish which facts are properly considered in making that determination, we first review appellant's challenges to Gutierrez' affidavit. Appellant contends that of the four references Gutierrez made to activity occurring at the Otis location, two were based on falsehoods, and one was of practically no probative value. More specifically, appellant argues (1) that Gutierrez' statement that Ortiz was seen at the location between January 7 and January 12 was contradicted by testimony at the suppression hearing; (2) the statement that Ortiz was seen at the location at 12:20 p.m. on January 14 is of very little probative value, because while Ortiz was seen to enter the Otis garage, he was not seen entering the apartment itself; and (3) the statement that Ortiz drove in a counter-surveillance manner from Benji's to the Otis location at 3:20 p.m. on January 14 is contradicted by Gutierrez' police report, which states that Ortiz drove from Benji's to the Evergreen location. Appellant contends that this leaves only the statement that Ortiz left for the drug deal from the Otis apartment, which, he argues, under the law of this circuit is not sufficient to establish probable cause.
 
 
 15
 The government has admitted that the first reference was made in error, and that Gutierrez was mistaken when he stated that he had seen Ortiz at the Otis apartment between January 7 and January 12, 1992. The government explains that Gutierrez simply confused those dates with January 14, 1992, when the activity at the Otis location actually took place.
 
 
 16
 With respect to the two January 14 sightings of Ortiz at the apartment, we are not persuaded that the affidavit is nearly as infirm as appellant maintains. As to the 12:20 p.m. sighting, appellant argues that because the affidavit states only that Ortiz went into the garage, we should not assume that he also went into the apartment: he might have remained in the garage for the two hours before he drove out again; or he might have exited the garage on foot. The affidavit does not mention any interim departures, however, and it is difficult to imagine that the officers, closing in on the drug dealers, would not have kept the location under constant surveillance once Ortiz had entered the garage. We are unwilling to assume that the officers might have seen Ortiz leave the garage but chose not to report it. Appellant is correct that Ortiz might have simply stayed in the garage for two hours, but common sense militates against that assumption. More importantly, the affidavit states that when Ortiz came to the Otis location the second time that day, at 3:20 p.m., he entered through the front door. Not only does this make it more likely that he also went into the apartment on the first occasion, it also provides a separate link between Ortiz and the apartment itself (rather than only the garage).
 
 
 17
 As to the second visit itself, we think that appellant makes far too much of the fact that the warrant omitted the fact that on his way from Benji's to Otis, Ortiz went to the Evergreen location. The fact remains that Ortiz left Otis (whether the garage or the apartment), performed a car switch at Benji's, engaged in counter-surveillance driving, and then returned to Otis. Whether he made one or more stops along the way is relatively unimportant. The crucial fact is that after these activities--and right before the drug deal--he ended up at the Otis apartment.
 
 
 18
 The fact that he was seen entering the apartment just before the drug deal distinguishes this case from United States v. Ramos, 923 F.2d 1346 (9th Cir.1991), on which appellant primarily relies. In Ramos, this court ruled that there was no probable cause to search an apartment where the affidavit stated that a vehicle which contained large quantities of narcotics had last been seen outside of the apartment complex. Appellant notes that here, as in Ramos, "[t]here are no allegations of anything being transported between the [vehicle] and the apartment," id. at 1352, and argues that therefore here, as in Ramos, there is an insufficient nexus between the vehicle in which the drugs were found and the place searched to support a finding of probable cause.
 
 
 19
 But appellant ignores the fact that in Ramos, the driver himself was not seen going into the apartment, 923 F.2d at 1352, whereas in this case, the affidavit clearly states that just before leaving for the drug deal, Ortiz entered the Otis apartment, SER at 12, and that earlier in the day he had been seen entering the Otis garage, from which a strong inference can be drawn that he then entered the apartment too.
 
 
 20
 The determinative question here is not whether there is a link between the car and the apartment, but rather whether there is "a nexus between the criminal activity and the places to be searched." Ramos, 923 F.2d at 1351 (emphasis added). That nexus is far closer here than it was in Ramos, since in this case it was the very person who sold the drugs, Ortiz, who was seen going into and coming out of the apartment, whereas in Ramos the person associated with the apartment was merely the driver of the van, was not observed transacting any business, and had turned the van over to another person by the time the drugs were seized. Through Ortiz, a strong connection between the apartment and criminal activity is established.[2]
 
 
 21
 Given this nexus, and looking at the totality of the circumstances, we conclude that on the basis of the uncontested facts in Gutierrez' affidavit, and notwithstanding Ramos, probable cause existed to believe that incriminating items would be found at the Otis apartment.
 
 
 22
 b. Facial attack on the warrant
 
 
 23
 Appellant next attacks the form of the warrant. The form used was a form for an arrest warrant rather than for a search warrant: it directed the executing officer "To search the following location(s): ________________ For the following person: ________________ and to seize and arrest him/her if found." Appellant notes that in filling out the warrant form, the police did not refer to any person to be arrested, and argues that the warrant therefore lacks the particularity required by the Fourth Amendment. Appellant relies heavily on Massachusetts v. Sheppard, 468 U.S. 981 (1984), a case in which all parties conceded that a warrant form for the seizure of controlled substances could not validly be used to authorize a search for evidence of a murder when the references to controlled substances in the body of the warrant had not been deleted.
 
 
 24
 Appellant's facial attack on the warrant is easily dispensed with. In both of the blanks on the warrant form, Officer Gutierrez typed "See Attached page 2." The attached pages state "To search the following locations [list of the four residences in question].... For the following property [list of potentially incriminating items]." Since the attached pages are incorporated into both the specification of places to be searched and the specification of persons to be seized, there can be little question but that the warrant authorizes the seizure of the items specified, and not of any unnamed persons. The warrant does not fail for lack of particularity if it is read in a commonsense manner--indeed, in the manner best supported by the face of the form and its attachments. Such a reading is clearly called for under the law of this Circuit. "Search warrants must ... be understood in a non-technical manner." United States v. McLaughlin, 851 F.2d 283, 286 (9th Cir.1988). We reject appellant's hypertechnical attack on the form of the warrant.
 
 
 25
 c. Franks hearing
 
 
 26
 In addition to moving to suppress the evidence seized from the Otis apartment, appellant moved for a Franks hearing: such a hearing affords a criminal defendant the opportunity to attack the veracity of statements made in a search warrant affidavit. Franks v. Delaware, 438 U.S. 154 (1978). A Franks hearing is available, however, only if (1) the defendant makes a substantial preliminary showing that a false statement was made knowingly or recklessly; and (2) the allegedly false statement is necessary to a finding of probable cause. 438 U.S. at 155-56. A district court's decision not to hold a Franks hearing is reviewed de novo. United States v. Burnes, 816 F.2d 1354, 1356 (9th Cir.1987).
 
 
 27
 As noted above, we conclude that probable cause existed even on the basis of the uncontested facts in the affidavit. We therefore also conclude that appellant failed to meet one of the threshold requirements for a Franks hearing, and that the district court did not err in denying him one.
 
 2. Warrantless Entry and Arrest
 
 28
 Before obtaining the search warrant, police officers knocked on the door of the Otis apartment; when Felix appeared at the window, they ordered him at gunpoint to open the door, and then seized his gun, arrested him, and secured the apartment.
 
 
 29
 The parties agree that warrantless protective sweeps are not immune from the normal rules governing warrantless seizures of property: they must be supported both by probable cause and by some exception to the warrant requirement, such as exigent circumstances. Segura v. United States, 468 U.S. 796, 810 (1984) (opinion of Burger, C.J. and O'Connor, J.); Huguez-Ibarra, 954 F.2d at 551; United States v. Howard, 828 F.2d 552, 554-55 (9th Cir.1987). The same analysis applies to appellant's arrest: while in general, warrantless arrests may be made solely on the basis of probable cause, United States v. Rodriguez, 869 F.2d 479, 482 (9th Cir.1989), warrantless arrests in the home are prohibited absent a combination of probable cause and exigent circumstances. United States v. George, 883 F.2d 1407, 1411 (9th Cir.1989). "Home" has taken on a broad meaning in the context of this rule: we have stated that the rule applies to nonpublic places generally, United States v. Alvarez, 810 F.2d 879, 881 (9th Cir.1987), and thus it extends to the Otis apartment regardless of indications that no one lived there, and that it was used solely as a stash pad.
 
 
 30
 Since we concluded that the search warrant was supported by probable cause, and since the officers who made the entry apparently had the same information at their disposal as was contained in Gutierrez' affidavit, we confine our discussion to exigent circumstances, the exception to the warrant requirement the government relies upon. Before reaching that issue, however, we note that under the independent source rule, the district court was correct in denying the motion to suppress with respect to the drugs and the money found in the apartment regardless of the legitimacy of the warrantless entry. Under similar circumstances, the Segura court explained that
 
 
 31
 evidence discovered during the subsequent search of the apartment ... pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence....
 
 
 32
 468 U.S. at 799; see also United States v. Moreno, 758 F.2d 425, 426-27 (9th Cir.1985) (following Segura ). Thus the only piece of evidence at stake here is the gun, which the officers neither "discovered" nor re-seized under the warrant.
 
 
 33
 We review de novo the determination that exigent circumstances existed. United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1298 (9th Cir.1988). This circuit has stated that
 
 
 34
 "Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained. The need for an immediate search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement."
 
 
 35
 United States v. Holzman, 871 F.2d 1496, 1506 (9th Cir.1989) (quoting United States v. Robertson, 606 F.2d 853, 859 (9th Cir.1979)).
 
 
 36
 Relying on cases such as Holzman, appellant emphasizes what the officers did not know before knocking on the door of the apartment: he points out that the officers had no information that either drugs or persons were inside, and that they therefore could conclude neither that evidence was likely to be destroyed nor that their own safety was in danger. In Holzman, such paucity of information was fatal: the court held that mere suspicion that accomplices may have been in the rooms searched and may have been despoiling evidence there did not meet Fourth Amendment standards for exigency. 871 F.2d at 1506-07. See also United States v. Delgadillo-Velasquez, 858 F.2d at 1298-99 (no exigency where no evidence that drugs, persons, or weapons were in residence); United States v. George, 883 F.2d at 1414-15 (no exigency where no evidence that defendant knew or was in danger of finding out about his imminent capture).
 
 
 37
 In response, the government argues that several cases have recognized that narcotics are by their very nature subject to easy destruction, and that exigent circumstances have sometimes been found when a drug courier has been arrested and consequently has failed to return to his confederates, since the courier's absence might alert those not yet apprehended that the police have become involved. United States v. Perdomo, 800 F.2d 916, 919 (9th Cir.1986). More to the point, the government points out that after the officers knocked and requested entry, Felix appeared, first at the window and then at the door, armed with a semi-automatic weapon. The government suggests that Felix's presence in the apartment supports the officers' conclusion that evidence was in danger of being destroyed, and that the fact that Felix was armed supports their concerns for their own safety.
 
 
 38
 The difference between appellant's and the government's versions of the purported exigency is a temporal one. Appellant evaluates the exigency on the basis of facts known to the officers before they knocked on the door; the government considers facts which came to light afterwards. The government sees the exigency developing as events occur, while appellant suggests that the exigency must be determined as of the moment the officers approached the apartment.
 
 
 39
 The following is the sequence of events: (1) the officers knocked at the door; (2) Felix appeared at the window; (3) the officers pointed their guns at Felix and ordered him to open the door; (4) Felix did so, at which point the officers saw that he was armed. The question is whether, in light of items # 1 and # 3, items # 2 and # 4 are properly taken into account in the evaluation of the exigency. Two distinct issues are involved. We proceed in reverse order.
 
 
 40
 (a) Time of seizure
 
 
 41
 The first question is whether Felix's armed status is properly taken into account, since it came to light only after the officers had confronted him at gunpoint. In United States v. Al-Azzawy, 784 F.2d 890, 893 (9th Cir.1985), cert. denied, 476 U.S. 1144 (1986), this court held that when a defendant was surrounded in his home by officers with drawn weapons and was ordered to step outside, he emerged only "under circumstances of extreme coercion," and that "[a]ny reasonable person would have believed he was under arrest in these circumstances." 784 F.2d at 893. Although the question in Al-Azzawy was where the arrest took place (inside or outside the home), implicit in the holding is a conclusion as to when the arrest took place: it clearly occurred at the time that the coercive circumstances were created.[3] Since the circumstances in this case are very nearly as coercive as those in Al-Azzawy, appellant's arrest took place when the officers ordered him to the door, at gunpoint, and thus before the fact that he was armed came to their attention. Logically, then, his armed status cannot be considered as an exigent circumstance justifying his arrest or the attendant seizure of his gun.
 
 
 42
 b. Creation of exigency
 
 
 43
 The second question is whether the officers' initial knock on the door precludes consideration of danger to the evidence as an exigent circumstance. Appellant argues that the knock should have this effect, and cites United States v. Curran, 498 F.2d 30 (9th Cir.1974). In that case, officers knocked at the door of a house suspected to be a drug trafficking location, thereby notifying the occupants of police presence. The exigent circumstances which the government argued justified its warrantless search in Curran clearly existed only because the officers had knocked at the door: it was only after the police had announced themselves that the occupants knew the police had discovered them, and that the occupants had the incentive to destroy evidence. 498 F.2d at 33.
 
 
 44
 In defense of this result, the government in Curran conceptualized the search in two stages: first the knock on the door (which it assumed to be valid); then the evaluation of newly discovered circumstances tending to justify further intrusion. The court, however, rejected that analysis, holding that "any exigent circumstances must be capable of justifying the entire raid up through the seizure of [the incriminating items]." 498 F.2d at 34. The court reasoned that under the government's approach, "the officers have come too close to creating their own exigency." Id.
 
 
 45
 Curran is distinguishable from this case. The Curran court was concerned with police officers' creation of an exigency as they stood on the threshold of a residence. 498 F.2d at 34. The case did nothing, however, to restrict officers' authority to gather, from that vantage point, evidence of a possible exigency.[4] See Perdomo, 800 F.2d at 919 (court affirms finding of exigent circumstances based on evidence that persons were inside the residence where drugs were thought to be stored and did not respond to officers' knocks--evidence the officers gathered by knocking at the door and listening to movements from within). Thus the officers in this case were entitled to consider the simple fact of Felix's presence in the apartment--and the consequent danger that evidence might be destroyed, particularly since Ortiz, the drug courier, had been waylaid, and this fact might well have come to Felix's attention. Perdomo, 800 F.2d at 919. Their presence did not create that exigency.
 
 
 46
 In sum, the officers were confronted with the fact that Felix was present in the apartment, and that his presence could have endangered evidence. In addition, they were aware of the easily destructible nature of narcotics. In light of these factors, we conclude that exigent circumstances existed, and justified the warrantless arrest and securing of the apartment. We therefore affirm in all respects the district court's denial of Felix's motion to suppress evidence.
 
 3. Plea Agreement
 
 47
 Appellant argues that the district court abused its discretion in applying a categorical rule rejecting all Rule 11(e)(3)(C) guilty pleas. A threshold issue is whether or not this question was preserved for appeal. The relevant provision of appellant's plea agreement states that
 
 
 48
 Pursuant to Rule 11(a)(2), you reserve the right to appeal the denial of your motion to suppress evidence (but not any other motion you may have brought herein).
 
 
 49
 Plea Agreement at 2. Fed.R.Crim.P. 11(a)(2) states that with the approval of the court, a defendant may enter a conditional guilty plea, "reserving in writing the right, on appeal from judgment, to review of adverse determination of any pretrial motion." This court has not hesitated to find that when issues are not reserved in writing, they may not be addressed on appeal. United States v. Eschegoyen, 799 F.2d 1271, 1275-76 (9th Cir.1986).
 
 
 50
 Appellant's response is that while the plea agreement precluded him from appealing any motions other than the motion to suppress, it did not prevent him from raising any other issues. Eschegoyen, however, states in affirmative terms that defendants must put in writing any issues they wish to reserve for appeal. It is this rule, rather than the language of the plea agreement, which forecloses the appeal of matters not put in writing. We therefore do not reach appellant's sentencing issue.
 
 
 51
 AFFIRMED.
 
 
 
 *
 Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this Circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 We assume without deciding that Felix had a protectable Fourth Amendment interest in the apartment; the government has never argued otherwise
 
 
 [2]
 In another case appellant relies on heavily, United States v. Huguez-Ibarra, 954 F.2d 546, the link between the criminal activity and the place searched was even weaker than in Ramos, and hence weaker than in this case. In Huguez-Ibarra, the police lacked probable cause to search a residence where they had neither found drugs in the cars parked outside the residence, nor directly linked the persons frequenting the residence with drug dealing. Id. at 551
 
 
 [3]
 It should be noted that this court has also made it clear that holding a suspect at gunpoint does not necessarily constitute an arrest. United States v. Del Vizo, 918 F.2d 821, 824 (9th Cir.1990). Al-Azzawy, however, indicates that the totality-of-the-circumstances approach which governs the inquiry into when an arrest has taken place generally leads to only one result when the suspect is apprehended in a private residence
 
 
 [4]
 The court did state that the police could not rely on the fact that one officer smelled marijuana from the doorway once the residents had opened the door, but the court did so in the context of a discussion of the plain view exception rather than exigent circumstances. 498 F.2d at 33